The Honorable Thomas S. Zilly

1

2

3

4

5

6

7              UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON

8

9   JOANNA P. MATTSON, on behalf of herself
    and all others similarly situated,

10                                                NO. 2:22-cv-00037-TSZ
                              Plaintiff,

11                                                FIRST AMENDED COMPLAINT –
         v.                                       CLASS ACTION

12

13   MILLIMAN, INC.; THE BOARD OF
     DIRECTORS OF MILLIMAN, INC.; THE
14   MILLIMAN INVESTMENT COMMITTEE,
     and its members; THE MILLIMAN INC. U.S.
15   RETIREMENT COMMITTEE, and its
     members, Does 1-30,

16                            Defendants.

17

18

19

20

21

22

23

24

25

26

FIRST AMENDED COMPLAINT – CLASS ACTION          BYRNES ♦ KELLER ♦ CROMWELL LLP
(NO. 2:22-cv-00037-TSZ)                                      38TH FLOOR
                                                        1000 SECOND AVENUE
                                                    SEATTLE, WASHINGTON  98104
                                                          (206) 622-2000

## FIRST AMENDED CLASS COMPLAINT FOR DAMAGES

## I.   INTRODUCTION

1.    Plaintiff Joanna P. Mattson brings this action under 29 U.S.C. §1132(a)(2) and (3), individually and on behalf of the Milliman, Inc. Profit Sharing and Retirement Plan (the "Plan") and a class of participants and beneficiaries of the Plan affected by the challenged conduct of the Milliman Defendants (as defined below). Plaintiff brings this action for breach of fiduciary duty under the Employee Retirement Income Security Act, 29 U.S.C. §§1001-1461 ("ERISA") against Defendants Milliman, Inc., the Board of Directors of Milliman, Inc. and its members, the committee that selects investment options for the Plan (the "Investment Committee") and its members, and the Milliman, Inc. U.S. Retirement Committee (the "Retirement Committee") and its members (collectively, "Milliman" or "Milliman Defendants").

2.    The Milliman Defendants are fiduciaries of the Plan. Accordingly, when constructing an investment line-up for the Plan, Milliman must independently investigate and regularly monitor each of the Plan's investment options with the care and skill of a prudent investor. The Milliman Defendants breached their fiduciary duty by failing to prudently monitor and failing to remove three of the Plan's poorly performing investment options.

3.    The Investment Committee is one of the Plan's fiduciaries that designates the investment options available under the Plan. The Investment Committee selected a suite of target risk funds: the Unified Trust Wealth Preservation Strategy Target Growth Fund (the "Aggressive Fund"), Unified Trust Wealth Preservation Strategy Target Moderate Fund (the "Moderate Fund"), and Unified Trust Wealth Preservation Strategy Target Conservative Fund (the "Conservative Fund") as three investment options for Plan participants (together, the "Unified Funds").

4.      The Unified Funds are a series of risk-based asset allocation funds that the Unified Trust Company offers exclusively for defined contribution and defined benefit plans. The Unified Funds are "target risk funds," which is a type of fund designed to "target" a predetermined risk level that reflects an investor's tolerance to risk.[1]

5.      As explained more fully in Section VI, target funds like the Unified Funds allocate their assets across a mix of equity securities, bonds, or cash based on the desired level of target risk. The higher the tolerance for risk, the higher the allocation is to investments deemed to be riskier, such as equity securities. Funds that target a lower level of risk allocate a higher percentage of resources to less risky investment options, such as bonds and other fixed income assets.

6.      In 2013 the Milliman Defendants placed the three Unified Funds on the Plan. Having only been launched in November 2012, the Unified Funds were brand new, had no investment track record, and were untested.

7.      By the end of 2013, the Plan was the sole investor in two of the three funds (the Moderate and Conservative Funds) and represented about 97% of the assets of the third fund (the Aggressive Fund), according to Department of Labor ("DOL") filings.

8.      Milliman's investment adviser affiliate, Milliman Financial Risk Management LLC, is the sub-adviser to the Unified Funds offered by the Plan.

---

[1] A target "risk" fund, which targets a particular risk level, should not be confused with a target "date" fund, which targets the investor's anticipated retirement date. A target risk fund remains at its targeted risk level for the life of the fund – i.e., if it is an aggressive fund, it remains aggressive. The portfolio of a target date fund, by contrast, gradually evolves over time from a more aggressive risk allocation to a more conservative risk allocation as the fund moves closer to the target date (i.e., the investor's planned retirement date).

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 2

9.      During the nine-plus years since their introduction to the Plan in 2013, the Unified Funds have significantly underperformed several meaningful benchmarks, including Dow Jones Target Risk Indexes that Defendants disclosed to Plan participants as appropriate benchmarks.

10.     Since 2015, the Unified Funds have also significantly underperformed the Custom Indexes which Defendants had identified in their Motion to Dismiss as meaningful benchmarks.

11.     But mere underperformance is not the whole story—the depth and breadth of the underperformance is as jarring as it is incomprehensible. Between January 1, 2013, and December 31, 2015, the Aggressive Fund's investment return underperformed the Dow Jones U.S. Aggressive Target Risk Index by a cumulative total of 19.02% vs. 47.91% and underperformed that same benchmark by a cumulative total of 53.03% vs. 111.26% between January 1, 2016 and July 31, 2022. This level of underperformance cannot be justified, and Defendants breached their fiduciary duties both in their initial placement of these untested funds on the Plan and in their failure to act timely to remove the Unified Funds from the Plan.

12.     Indeed, due to this abysmal record of significant performance year after year, the Plan fiduciaries should have removed the Unified Funds from the Plan by January 13, 2016. However, even with a marketplace teeming with hundreds of better performing investment options, the Milliman Defendants did not remove any of the Unified Funds from the Plan.

13.     The Milliman Defendants' ongoing decision to take no action is both imprudent and injurious to the Plan and its participants, including Plaintiff Mattson.

14.     No prudent investor acting with an eye single to the interests of Plan participants would have sat idly by in the face of such underperformance.

15.     This failure to act has had devastating consequences for participants' retirement accounts. To date, these Unified Funds have taken in nearly a quarter billion dollars of retirement

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 3

investments from Plan participants. The Milliman Defendants' imprudent decision to retain the Unified Funds has simultaneously impaired the Plan's overall investment performance and squandered millions in participants' retirement savings.

16.     To remedy Milliman's breach of fiduciary duty, Plaintiff brings this action under 29 U.S.C. §1132(a)(2) and (3), individually, on behalf of the Plan, and as a representative on behalf of a class of participants and beneficiaries of the Plan to enforce the Milliman Defendants' personal liability under 29 U.S.C. §1109(a), to make good to the Plan all losses resulting from each breach of fiduciary duty occurring during the time period from January 13, 2016 to the date of judgment (the "Class Period"). In addition, Plaintiff seeks such other relief for the Plan as the Court may deem appropriate.

## II.     PARTIES

### A.  Plaintiff

17.     Joanna P. Mattson brings this suit in a representative capacity on behalf of the Plan pursuant to 29 U.S.C. §1132(a), seeking appropriate relief under 29 U.S.C §1109 to protect the interests of the entire Plan. Plaintiff Mattson was a participant in the Plan, as defined in 29 U.S.C. §1002(7), during the Class Period. Plaintiff Mattson suffered individual injury by investing in the Plan's poorly performing Moderate Fund.

### B.  Defendant

18.     Milliman, Inc. is headquartered in Seattle, Washington, and is an independent risk management, benefits, and technology firm with offices in major cities around the globe. Milliman, Inc. is the Plan's sponsor. Milliman, Inc. acts through a Board of Directors. Milliman, Inc. either exercises discretionary authority and/or discretionary control respecting management of the Plan or has delegated the duty to a group or committee of persons.

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 4

BYRNES ◆ KELLER ◆ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

19.     The Investment Committee is the committee who Milliman, Inc. may have delegated the duty of exercising discretionary authority and/or discretionary control over the investment options available under the Plan.[2] Current and former members of the Investment Committee are fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority and/or discretionary control respecting management of the Plan.

20.     The Milliman, Inc. U.S. Retirement Committee administers the Plan. Current and former members of the Retirement Committee are fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority and/or discretionary control respecting management of the Plan.

21.     Because Plaintiff is currently unaware of the identities of the individual members of the Board of Directors, the Retirement Committee, and the Investment Committee, those individuals are collectively named as Defendants Does 1-30. Plaintiff will substitute the real names of the Does when they become known to Plaintiff. To the extent the Milliman Defendants delegated any of their fiduciary functions to another person or entity, the nature and extent of which has not been disclosed to Plaintiff, the person or entity to which the function was delegated is also a fiduciary under 29 U.S.C. § 1002(21)(A) and thus alleged to be a Doe Defendant.

## III.    JURISDICTION, VENUE, AND STANDING

22.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. § 1132(a)(2) and

---

[2] The Investment Committee is a fictitious name for the committee who is responsible for designating the investment options available under the Plan. The proper name of this Investment Committee is solely within the possession of the Defendants. While Defendants corrected the name of the "Administrative Committee" in its Motion to Dismiss (Dkt. No. 34), they did not correct the name of the Investment Committee. Accordingly, Plaintiff suspects the Investment Committee is the proper name of this committee. However, should discovery reveal that Defendants use another name to identify the Investment Committee, Plaintiff will seek to amend the Complaint.

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 5

(3).

23.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the subject Plan is administered and where at least one of the alleged breaches took place. It is also the District in which Defendant Milliman resides.

24.     As a Plan participant and holder of the Moderate Fund, Plaintiff has standing to bring claims on behalf of the Plan pursuant to 29 U.S.C. §1132(a)(2), as she is a participant seeking appropriate relief under 29 U.S.C. §1109. Thus, Plaintiff brings this suit under §1132(a)(2) in a representative capacity on behalf of the Plan as a whole and seeks remedies under §1109 to protect the entire Plan.

25.     Plaintiff has standing to bring claims on behalf of the holders of all the Unified Funds because the alleged harms to holders of the other Unified Funds can be traced to the same challenged conduct: the imprudent process Milliman Defendants used to select, monitor, and retain the suite of Unified Funds. This singular conduct with respect to the Unified Funds harmed each of the holders of the specific Unified Funds discussed in this Complaint.

## IV.     ERISA'S FIDUCIARY STANDARDS

### A. Fiduciary Duties of Prudence and Loyalty

26.     ERISA imposes strict fiduciary duties of prudence and loyalty upon the Milliman Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a). These duties apply to all fiduciary acts, including Milliman's monitoring, and retention of investment options for the Plan.

27.     ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B). Accordingly, fiduciaries must

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

vigorously and independently investigate each of the Plan's investment options with the skill of a prudent investor.

28.     As part of its fiduciary duty, Milliman "has a continuing duty to monitor [Plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id*. at 530. If an investment is imprudent, Milliman "must dispose of it within a reasonable time." *Id*.

29.     ERISA's duty of loyalty requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan[.]" *See* 29 U.S.C. § 1104(a)(1)(A); *see also* 29 U.S.C. § 1103(c)(1) ("the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

30.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Donovan v. Bierwirth*, 680 F.2d 263, 271-272 & n.8 (2d Cir. 1982). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dept. of Labor ERISA Advisory Op. 88-16A, (Dec. 19, 1988) (emphases added).

### B. Fiduciary Liability Under ERISA

31.     Under 29 U.S.C. § 1109, fiduciaries to the Plan are personally liable to make good to the Plan any harm caused by their breaches of fiduciary duty. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

### C. Co-Fiduciary Liability

32.     ERISA provides for co-fiduciary liability where a fiduciary knowingly participates in, or knowingly fails to cure, a breach by another fiduciary. Specifically, under 29 U.S.C. § 1105(a), a fiduciary shall be liable for a breach of fiduciary duty by a co-fiduciary:

   i.     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

   ii.     if, by his failure to comply with [29 U.S.C. §] 1104(a)(1) . . . in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

   iii.     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

### V.     THE PLAN

33.     The Plan is a defined contribution plan that includes a "deferred arrangement" as described in Section 401(k) of the Internal Revenue Code, I.R.C. § 401(k) (1986) and is subject to the provisions of ERISA. Milliman, Inc. is the sponsor of the Plan.

34.     The Plan provides for retirement income for approximately 4,300 participants, comprised of Milliman employees, former employees, and their beneficiaries (the "Plan participants"). A participant's retirement account balance depends on contributions made by each

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

employee, Milliman's matching contributions, and the performance of investment options net of fees and expenses. Accordingly, poor investment performance can significantly impair the value of a participant's account. Over time, even seemingly small differences in performance can result in a significant difference in the amount of savings available at retirement. The Milliman Defendants control the selection and retention of the Plan's investment options.

35.     The Plan has approximately $1.7 billion in assets under management.

36.     Plan participants have invested nearly $250,000,000 in the Unified Funds as of November 30, 2020. In 2020, the Plan identified the following Unified Funds along with the amount of Plan assets invested in each fund:

| Fund Name | Plan Option Assets |
|---|---|
| Unified Trust Wealth Preservation Strategy Target Growth | $89,218,002 |
| | |
| Unified Trust Wealth Preservation Strategy Target Moderate | $93,384,339 |
| | |
| Unified Trust Wealth Preservation Strategy Target Conservative | $56,944,846 |

37.     With $1.7 billion in assets, the Plan has tremendous leverage to demand and receive superior investment products and services. But the Milliman Defendants did not use their leverage to identify and select prudent target risk options for Plan participants. Instead, the Milliman Defendants opted for poorly performing options for which they serve as sub-adviser.

## VI.     OVERVIEW OF TARGET RISK FUNDS

38.     The Unified Funds are funds in the Wealth Preservation Target Risk Funds Suite.

39.     **Section VI** describes the aims, risks and rewards of target risk funds in general.

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 9

40.     **Section VII** describes the aims, risks and rewards of each Unified Fund and then shows why three target investment indexes and two target risk funds share similar aims, risks and rewards and thus are meaningful comparators.

**A.  Aims and Potential Rewards of Target Risk Funds**

41.     A target risk fund's primary investment aim is to achieve the highest total return consistent with a level of risk that matches the investor's risk tolerance, i.e., moderate, moderately aggressive or aggressive. Total return is measured by long-term capital growth and income.

42.     The potential reward of investing in a target risk fund is that the target risk fund outperforms its benchmarks and comparator funds that have a similar level of risk.

**i. Classification of Target Risk Funds**

43.     A fund's risk level— "aggressive," "moderately aggressive" or "moderate"—is a product of how the portfolio manager allocates the fund's investments across various asset classes.

44.     For example, Morningstar, the leading independent authority on investment classifications and compositions in the investment world and a source relied upon by nearly all sophisticated investors in the United States, identifies a fund that invests 85% or more of its assets in equity securities (e.g., common and preferred stock or pooled funds that invest in the same) as an "aggressive" target risk; a fund that offers investors a fund that invests between 70% and 85% or more of its assets in equity securities as a "moderately aggressive" target risk; and a fund that invests between 50% and 70% in equity securities as a "moderate" target risk.

45.     The Plan's Annual Disclosure Statement to Plan participants uses the same range of percentages  to describe the equity asset allocation levels of the Unified Funds – 85%+ for the Aggressive Fund, 70%-85% for the Moderate Fund and 50%-70% for the Conservative Fund.

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 10

46.     A fund's name is not determinative of its level of risk. For example, a fund with the name "conservative" may pursue a moderate target risk strategy (e.g., the Unified Trust Wealth Preservation Strategy Target Conservative Fund).

### ii. How Target Risk Funds Achieve Their Aims.

47.     Target risk funds, such as the Unified Funds, may pursue their objective by investing in other underlying funds such as mutual funds, exchange traded funds ("ETFs"), and collective investment funds. Funds that invest in other funds are commonly referred to as "a fund of funds."

48.     Target risk funds seek to achieve their risk objectives by allocating their assets into what the fund's portfolio manager deems to be an optimal mix of two assets classes – equity and fixed income securities. Some funds may also transact in funds tied to futures and options contracts.

49.     The equity allocation is intended to provide exposure to specific market segments or sub-asset classes. Typically, those segments include U.S. large- and small-capitalization companies and international (non-U.S.) developed and emerging markets. The portfolio manager's aim should be to build a portfolio that provides exposure to factors commonly tied to a stock's potential for enhanced risk-adjusted returns relative to the market. Those factors include, but are not limited to, value, quality, momentum, size, and low volatility.

50.     The fixed income allocation is intended to provide diversified exposure across a wide range of lower-risk market sectors, including U.S. government obligations, corporate bonds, other U.S. aggregate bond sectors (including mortgage- and asset-backed securities), and emerging market and international fixed income issues. The portfolio manager's aims should be to provide broadly diversified fixed income exposure and construct a portfolio to enhance issuer

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1   diversification and liquidity.

2       51.   A fund's portfolio manager adjusts the allocations among asset and sub-asset

3   classes based on their analysis of various market conditions.  Factors that a portfolio manager may

4   consider include, but are not limited to, market trends, perceived risk, their outlook for a given

5   market capitalization, and the underlying funds' performances in various market conditions.

6       52.   Without distinctions between portfolio holdings, all target risk funds would own

7   identical investment portfolios and have nearly identical investment performance. Thus, artful

8   asset allocation and careful investment selection typically drive superior investment performance

9   over time and distinguish the better performing target risk funds from the underperforming ones.

10  Bad asset allocation and poor investment selection generally drive long-term underperformance.

11  **B. The Risks Associated With Target Risk Funds.**

12      53.   The level of risk—the probability that the fund will experience losses relative to

13  the expected return—is typically reflected by the fund's allocations into different asset classes. For

14  instance, a fund normally has a higher investment risk if it has a greater exposure to equity

15  securities. Generally, a fund's investment risk decreases as it shifts its exposure from equity

16  securities to investment grade bonds.

17      54.   By managing risk, a fund also inherently manages components of risk, including

18  volatility. Volatility is the distribution of returns for a fund over time, typically measured by the

19  standard deviation of annualized returns over a period of time. A fund that alternates between very

20  high and very low annualized returns will be more volatile than a fund that consistently has

21  mediocre returns, even though the returns of the two funds are the exact same. Volatility, like risk,

22  can be managed through a diversified investment portfolio that allocates monies to different asset

23  classes or hedging strategies.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

55.   The principal categories of risks for target risk funds include market risk, allocation risk, large company risk, small and mid-sized company risk, international investing risk, fixed income risk, and fund of funds risk.

56.   Market risk is the chance that stock prices overall will decline (*i.e.*, equities). The higher a fund is allocated to equity securities, the greater the fund is exposed to market risk. Stock markets tend to move in cycles, with periods of rising prices and periods of falling prices, so each fund is subject to the risk that the market as a whole will fall. The value of stocks held by a fund may decline due to factors that affect a particular company, industry, or the stock markets in which the fund invests. Unforeseen market disruptions, such as Covid-19, can also adversely affect local and global markets as well as normal market conditions and operations. Any such disruptions could have an adverse impact on the value of a fund's investments and fund performance.

57.   Allocation risk is the risk arising from a portfolio manager's decision on how to allocate the fund's resources across particular asset classes or sub-asset classes (*e.g.* large-cap, small-cap). For example, all else being equal, a fund that is overweight with small-cap stock funds relative to benchmarks and peers will underperform those benchmarks and peers if small-cap stocks experience a decline in prices. The higher the overweight to poor performing asset classes, the worse the fund's performance will be relative to benchmarks and peers.

58.   There are also risks inherent in the asset classes themselves. For example, small and mid-cap investments tend to be more risky and more volatile than large-cap investments, because small and midsize companies generally are more vulnerable to economic volatility. Likewise, international investments have risks associated with fluctuations in foreign currency exchange rates.

59.    Fixed income investments, such as bonds, are not risk free. The risks associated with these investments include credit risk (the chance that the issuer of a security will fail to pay interest or principal in a timely manner or that negative perceptions of the issuer's ability to make such payments will cause the price of that security to decline, thus reducing an underlying fund's return) and income risk (the chance that an underlying fund's income will decline because of falling interest rates).

60.    When a fund invests in other underlying investment funds, there is also a fund of funds risk. The investment objective or risks of an underlying fund may differ from those of the overarching fund. There is no guarantee that the underlying funds will achieve their investment objectives. The underlying funds may also impose restrictions on the timing of admissions to or withdrawals from the underlying funds that differ from the overarching fund's policy with respect to the timing of admissions and withdrawals, which could impact the overarching fund's liquidity.

## C.  401(k) Plan Fiduciaries and Investment Advisers Select Benchmarks to Evaluate the Performance of Target Risk Funds.

61.    In evaluating the performance of a target risk fund, fiduciaries of 401(k) plans and investment advisers of target risk funds select benchmarks that they believe share similar aims, risks, and potential rewards as the underlying target risk fund.

62.    ERISA requires fiduciaries of a defined contribution plan to disclose to each participant "the name and returns of an ***appropriate broad-based securities market index*** over the 1-, 5-, and 10-calendar year periods" as a benchmark for each designated investment option. 19 C.F.R. § 2550.404a-5(d)(1)(iii) (emphasis added). In implementing the Final Rule, the Department of Labor stated that if an investment adviser believed that the appropriate broad-based securities market index was *not* representative of the investment option, it may disclose a supplemental

benchmark as well. *See* Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans, 75 Fed. Reg. 64910, at 64916-17 (Oct. 20, 2010). A defined-contribution plan must provide information that is "complete and accurate." 29 C.F.R. § 2550.404a-5(b)(1). Disclosing incomplete or inaccurate information to plan participants amounts to a breach of fiduciary duty under ERISA.

**VII.     THE UNIFIED TARGET RISK FUNDS AND THEIR BENCHMARKS**

63.     The Unified Funds were launched in November 2012 as a series of target risk funds that are offered exclusively for defined contribution and defined benefit plans.

64.     In 2013, Milliman selected the Aggressive Fund, Moderate Fund, and Conservative Fund as three investment options for Plan participants. They are the only options in the Plan that give participants the ability to invest using specific target risk strategies. In other words, Plan participants who want to pursue a target risk investment strategy have no choice other than to invest in one of the Unified Funds.

65.     Further, as noted above, the Unified Funds are sub-advised by Milliman's investment adviser affiliate, Milliman Financial Risk Management LLC. Milliman benefits by having its affiliate be the sub-adviser of captive investments that total nearly $250,000,000, allowing Milliman to promote new investment products and boost its investment management business.

66.     As explained more fully below, Plaintiff identifies the following as meaningful benchmarks for each fund: (1) the Dow Jones Target Risk Indexes that the Plan fiduciaries have identified as appropriate benchmarks for the Unified Funds to the Plan participants, as required by DOL Rule 404(d)(1)(iii), 29 CFR § 2550.404a-5(d)(1)(iii); (2) the Custom benchmarks that Defendants identified in their Motion to Dismiss the Complaint as meaningful benchmarks for the

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington 98104
(206) 622-2000

Unified Funds; (3) the Morningstar Target Risk Indexes; and (4) specific similar target risk funds identified by Plaintiff that are available in the general investment marketplace.

### A. The Aggressive Fund and Its Benchmarks

#### i. The Aggressive Fund

67.     The Aggressive Fund is a fund in the Wealth Preservation Target Risk Funds co-managed by Defendants and Unified. The Aggressive Fund's aim is to seek capital growth and income consistent with its current asset allocation.

68.     Unified and Milliman state in the Aggressive Fund's fact sheet that it has a volatility target of 12%; however, that target was not a fundamental investment policy and Unified could deviate from it at will. Unified and Milliman offer the following disclaimer in the Aggressive Fund's pitch materials: "There is no guarantee that the fund will meet its volatility target objectives. Both the Fund's volatility target and asset allocation may be changed without the prior consent of participant investors and at the sole discretion of the Fund's Trustee."

69.     To achieve its aims, the Aggressive Fund is diversified across asset and sub-asset classes that included stock funds, which were further allocated among large-cap, mid-cap and small-cap stocks, and fixed income funds, which were further allocated among bonds and short-term money market instruments. It is structured as a fund of funds.

70.     The Aggressive Fund's potential rewards were to generate levels of total return that outperformed other comparator funds and beat its relevant benchmarks.

71.     The Aggressive Fund's primary risk stems from its aggressive allocation to equity securities. The 2021 Plan's Fee Disclosure Notice to Plan participants lists the Aggressive Fund's equity allocation at 85% or more. According to its December 31, 2021 Fact Sheet, the Aggressive Fund allocated 87% to equity securities, which was divided into large-cap, mid-cap, small-cap,

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 16

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

and international stocks. Finally, about 13% of its portfolio was invested in fixed income and other short-term investments.

72.     Accordingly, the Aggressive Fund's principal risks were related to (1) market risk, (2) allocation risk, and (3) investing in large-, small- and mid-cap stocks, international stocks, and fixed income securities. Also, the Aggressive Fund, as a fund of funds, was exposed to a fund of funds risk.

### ii. Aggressive Fund Benchmark 1: The Dow Jones U.S. Aggressive Target Risk Index

73.     The Dow Jones Relative Risk Indexes measure the performance of weighted return indexes that consist of varying allocations to equity, fixed income, and cash component indexes to represent a respective level of relative risk. The Dow Jones Index family has five risk profiles—aggressive, moderately aggressive, moderate, moderately conservative, and conservative. These profiles are defined based on incremental levels of potential risk relative to the risk of an all-stock index. Each Dow Jones Relative Risk Index is made up of three major asset classes: stocks, bonds, and cash. Within the equity allocation are sub-asset classes that include large-, small- and mid-cap stocks.

74.     As discussed above, ERISA requires fiduciaries of a defined contribution plan to disclose to each participant "the name and returns of an ***appropriate broad-based securities market index*** over the 1-, 5-, and 10-calendar year periods" as a benchmark for each designated investment option. 29 C.F.R. § 2550.404a-5(d)(1)(iii).

75.     In its Participant Fee Disclosure Notice, Defendants disclosed to the Plan participants that the Aggressive Fund was benchmarked to the Dow Jones U.S. Aggressive Target Risk Index (the "DJ Aggressive Risk Index"). Defendant stated it provided this benchmarking

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

information to the Plan participants to "show[] how the[] option[] ha[s] performed over time" and to allow participants "to compare [the option] with an appropriate benchmark for the same time periods." Defendants did not offer another benchmark for the Aggressive Fund in the Disclosure Notice to Plan participants.

76.     By disclosing the DJ Aggressive Risk Index to Plan participants as the appropriate benchmark for the Aggressive Fund, the Defendants necessarily concluded that the DJ Aggressive Index was, in fact, "representative of the investment option" and thus shared similar aims, risks and rewards. Otherwise, to have disclosed an inaccurate or inappropriate benchmark to Plan participants could constitute a breach of fiduciary duty under ERISA. Defendants cannot now claim the DJ Aggressive Risk Index is not a meaningful benchmark for the Aggressive Fund.

77.     Dow Jones designs its Aggressive Risk Index to serve as an appropriate benchmark for portfolios, like the Aggressive Fund. The DJ Aggressive Risk Index may allocate up to 90% in equity securities, with at least 5% in cash and 5% in fixed income securities. Like the Aggressive Fund, the DJ Aggressive Risk Index allocates its portfolio among the sub-asset classes of equity securities, *i.e.*, large-, small- and mid-cap stocks.

78.     By virtue of the similarities in their respective asset allocations, the DJ Aggressive Risk Index and the Aggressive Fund share similar aims, rewards and levels of risk, including market, allocation, fixed income, and large-, mid- and small-cap risks.

79.     Accordingly, the DJ Aggressive Risk Index represents a meaningful benchmark for the Aggressive Fund.

### iii. Aggressive Fund Benchmark 2: Defendants' Custom Growth Index

80.     In their Motion to Dismiss, Defendants also identified three Custom benchmarks that Unified used in its marketing materials as comparators for investors to evaluate each of the

Byrnes ♦ Keller ♦ Cromwell llp
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Unified Funds. Dkt. 34-1, Exs. 3-5. According to the marketing materials, the Aggressive Fund used the Custom Growth Index. Defendants cannot now claim the Custom Growth Index is not a meaningful benchmark for the Aggressive Fund.

81.     The Fund advisers Milliman Financial Risk Management LLC and Unified Trust Company specifically developed the Custom Growth Index, to evaluate the Aggressive Fund's performance since December 17, 2014. The Custom Growth Index has been a weighted blend of the following market indexes: (1) the Bank of America Merrill Lynch 3-Month U.S. Treasury Bill Index (8%), (2) the Barclays Capital U.S. Aggregate Index (7%), (3) the S&P 500 Index (56%), (4) the S&P MidCap 400 Index (11%), (5) the Russell 2000 Index (6%), and (6) the FTSE Global All Cap ex U.S. Index (12%).

82.     As illustrated in the chart below, the December 31, 2021 Fact Sheet for the Aggressive Fund shows that the asset allocation of the Aggressive Fund is almost a mirror image of the asset allocation of its corresponding Custom Growth Index.

| Asset Class | Aggressive Fund | Custom Growth Index |
|---|---|---|
| Fixed Income | 7.02% | 7% |
| Large Cap | 58.24% | 56% |
| Mid Cap | 11.07% | 11% |
| Small Cap | 5.82% | 6% |
| International | 11.87% | 12% |
| Cash and Equivalent | 5.97% | 8% |
| Net Futures Position | -2.56% | N/A |

83.     Although the Court asked Plaintiff to show that the meaningful benchmarks share similar aims, risks, and potential rewards, the Custom Growth Index shares not just similar aims, risks, and potential rewards, but almost identical aims, risks, and potential rewards with the Aggressive Fund. Accordingly, the Custom Growth Index is a meaningful comparator.

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 19

#### iv. Aggressive Fund Benchmark 3: The Morningstar Aggressive Target Risk Index

84.     Morningstar, Inc. ("Morningstar") is a highly regarded financial services and research firm.[3] Indeed, in the 2021 Fee Disclosure Notice to participants, Defendants expressly acknowledge that Morningstar is a reliable source.

85.     Beginning in 1996, Morningstar created the Morningstar Category classifications to assist investors in making meaningful comparisons between funds. Morningstar recognized that many funds' descriptions of what they were invested in, i.e., "growth funds," were not accurate. The Morningstar Category classification methodology sought to remedy this disconnect through categorizing funds into appropriate peer groups, or a Morningstar Category.

86.     Importantly, a Morningstar "category" is not the same as a Morningstar "peer universe." A category is a more discrete, smaller and more targeted collection of similar investments than a peer universe.

87.     Morningstar selects funds for a Morningstar Category using a proprietary classification methodology that compares funds based on their underlying portfolio holdings. To belong in the same Morningstar Category, each fund must have similar underlying portfolio holdings dating back at least three years. Morningstar's expert editorial team reviews and approves the category assignments for each fund.

88.     Morningstar states that "[t]he driving principles behind the classification system" include ensuring portfolios share the same risk factors and behave more similarly to one another than portfolios outside the categories.

---

[3] Morningstar is the leading provider of independent investment research products (e.g., data and research insights on managed investment products, publicly listed companies, and private capital markets) relied upon by individual investors, financial advisors, asset managers, retirement plan providers and sponsors, and institutional investors in the private capital markets in North America, Europe, Australia, and Asia.

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 20

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

89.     Morningstar's category assignment process is exhaustive and ongoing. Morningstar regularly reviews and updates the portfolios and categories to ensure that its system is accurate and compares like funds. Twice per year, Morningstar engages in a formal category review process. First, Morningstar uses a proprietary quantitative tool that proposes category recommendations based on the portfolio statistics and compositions over the past three years. These are calculated based on the investments' underlying holdings. The quantitative components include statistics on each fund's asset allocation and market capitalization. Once the category is proposed, Morningstar employees take a holistic view of the fund, including a review of the strategy, and decide whether to accept or reject the quantitative proposal.

90.     For each Morningstar Category, Morningstar has created benchmark indexes against which to compare the investment performance of any given fund. It assigns the funds within the category to its benchmark.

91.     Based on its lengthy and detailed category assignment process, which accounts for the aims, risks, and potential rewards of the funds, Morningstar assigned the Aggressive Fund to the Morningstar Allocation 85%+ Equity category. Morningstar states that funds in this category "seek to provide both income and capital appreciation by investing in multiple asset classes, including stocks, bonds, and cash," which is an accurate description of the Aggressive Fund's aims. Like the Aggressive Fund, funds in this category have equity exposures of more than 85%. Also like the Aggressive Fund, funds in this category typically allocate 10% of its equity holdings to foreign companies. This Morningstar Allocation 85+% Category coincides with the asset allocation description that the Milliman Plan applied to the Aggressive Fund (i.e., allocation of over 85% to equities) in the 2021 Fee Disclosure Notice to participants.

92.     For benchmarking purposes, Morningstar assigns the Morningstar Moderately Aggressive Target Risk Index to the funds in the Morningstar 70%- 85% Equity Allocation because, in Morningstar's evaluation, they have similar underlying holdings.

93.     Like the Aggressive Fund, the Morningstar Aggressive Target Risk Index allocates to large-, mid- and small-cap funds, international funds, and bond funds. Expectedly, Morningstar assigns the Morningstar Aggressive Target Risk Index as the appropriate benchmark for the Aggressive Fund.

94.     By maintaining an asset allocation similar to the Morningstar Aggressive Target Risk Index, the Aggressive Fund shares similar aims, risk, and potential rewards with its Morningstar Index. Accordingly, the Morningstar Aggressive Target Risk Index represents a meaningful benchmark for the Aggressive Fund.

### v.     Aggressive Fund Benchmarks 4 and 5: Similar Target Risk Funds

### a.     Benchmark 4: Alerus Aggressive Growth Institutional Fund

95.     The Alerus Aggressive Growth Institutional Fund ("Alerus Aggressive Fund"), a target risk fund, has similar aims, risks, and rewards to the Aggressive Fund. The Alerus Aggressive Fund allocates between 80-100% of its assets to investment funds that own equity securities and seeks returns commensurate with its asset allocation and risks. While the Alerus Aggressive Fund does not have a volatility target, *per se*, as of July 31, 2022, its historical volatility is 12.477%, which is in line with the Aggressive Fund's 12% volatility target.

96.     To achieve its aims, the Alerus Aggressive Fund is diversified across asset classes. Like the Aggressive Fund, it invests in exchange traded funds and mutual funds and primarily utilizes indexed investments. It is structured as a fund of funds.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

97.     The potential reward of the Alerus Aggressive Fund is outperforming other comparator funds with similar asset allocations, like the Aggressive Fund.

98.     Like the Aggressive Fund, the Alerus Aggressive Fund's primary risk arises from its aggressive allocation to equity securities. Historically, the Alerus Aggressive Fund has allocated approximately 84% to equity securities, which is  similar to the approximate 87% that the Aggressive Fund allocates to equity securities like the Aggressive Fund, the Alerus Aggressive Fund has divided its equity allocations among large-cap, mid-cap, small-cap and international assets. The Alerus Aggressive Fund has invested approximately 15% in bonds and short-term money market instruments, which is also in line with the Aggressive Fund's 13% allocation.

99.     Like the Aggressive Fund, the Alerus Aggressive Fund has market risk, allocation risk, fund of funds risk, and large-cap, small-cap and mid-cap stocks, international assets, and fixed income security risks.

100.     Given the similarities in portfolio composition, the aims, risks and potential rewards of the Alerus Aggressive Fund are similar to the Aggressive Fund, making the Alerus Aggressive Fund a meaningful comparator.

### b.   Benchmark 5: Transamerica Long Horizon - CTF

101.     The Transamerica Long Horizon – CTF Fund ("Transamerica Horizon Fund"), a target risk fund, has similar aims, risks, and rewards as the Aggressive Fund. The Transamerica Horizon Fund seeks to provide long-term returns from growth of capital and growth of income. While it does not have a volatility target, as of July 31, 2022, the Transamerica Horizon Fund's historical volatility is 13.47%.

102.     To achieve its aims, the Transamerica Horizon Fund is diversified across asset classes. It invests in exchange traded funds and mutual funds. Like the Aggressive Fund, it is

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington  98104
(206) 622-2000

structured as a fund of funds.

103.     The potential reward of the Transamerica Horizon Fund, like the Aggressive Fund, is outperforming its benchmark and other comparator funds.

104.     Like the Aggressive Fund, the Transamerica Horizon Fund's primary risk is due to its aggressive allocation to equity securities. As of June 30, 2022, the Transamerica Horizon Fund allocated approximately 88% to equity securities, which is similar to the Aggressive Fund's approximately 87% allocation.  Like the Aggressive Fund, the Transamerica Horizon Fund divided its equity allocations to large-cap, mid-cap and small-cap stocks, and international assets. The Transamerica Horizon Fund invested approximately 12% in bonds and short-term money market instruments, similar to the Aggressive Fund's 13% allocation to those asset classes.

105.     Like the Aggressive Fund, the Transamerica Fund has market risk, allocation risk, fund of funds risk, and large-cap, small-cap and mid-cap stocks, international assets, and fixed income security risks.

106.     Given the similarities in portfolio composition, the aims, risks and potential rewards of both funds are similar, making the Transamerica Horizon Fund a meaningful comparator.

**B.  Moderate Fund and Its Benchmarks**

   **i. The Moderate Fund**

107.     The Moderate Fund is a fund in the Wealth Preservation Target Risk Funds suite co-managed by Defendants and Unified. The Moderate Fund's aim is to seek capital growth and income consistent with its current asset allocation. The Moderate Fund has a volatility target of 10%; however, that target is not a fundamental investment policy and Unified could deviate from it at will. In fact, Unified and Milliman offer the following disclaimer in the Moderate Fund's pitch

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 24

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

materials: "There is no guarantee that the fund will meet its volatility target objectives. Both the Fund's volatility target and asset allocation may be changed without the prior consent of participant investors and at the sole discretion of the Fund's Trustee."

108.    To achieve its aims, the Moderate Fund is diversified across asset and sub-asset classes. It is structured as a fund of funds.

109.    The Moderate Fund's potential rewards were to outperform other comparator funds and beat its relevant benchmark indexes.

110.    The Moderate Fund's primary risk stems from its moderately aggressive allocation to equity securities. The 2021 Plan's Fee Disclosure Notice to Plan participants lists the Moderate Fund's equity allocation at between 70% and 85%. According to its December 31, 2021 Fact Sheet, the Moderate Fund had allocated approximately 70% to equity securities, which was divided among large-cap, mid-cap, small-cap and international stocks. Finally, about 30% of its portfolio was invested in fixed income and other short-term investments.

111.    Accordingly, the Moderate Fund's principal risks are related to (1) market risk, (2) allocation risk, and (3) investing in large-, small- and mid-cap stocks, international stocks, and fixed income securities. Also, the Moderate Fund, as a fund of funds, was exposed to a fund of funds risk.

### ii. Moderate Fund Benchmark 1: The DJ Aggressive Risk Index or the Dow Jones U.S. Moderately Aggressive Target Risk Index

112.    By disclosing the DJ Aggressive Risk Index as the only appropriate benchmark in the 2021 Fee Disclosure Notice, Defendants necessarily believed the DJ Aggressive Risk Index shared similar aims, risks, and rewards with the Moderate Fund. Otherwise, to have disclosed an inaccurate or inappropriate benchmark to Plan participants could constitute a breach of fiduciary

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1    duty under ERISA. Defendants cannot now claim the DJ Aggressive Risk Index is not a

2    meaningful benchmark for the Moderate Fund.

3            113.    Nevertheless, the Court noted that the "'aggressive' Dow Jones index would appear

4    to be an inappropriate comparator" and asked Plaintiff for additional information. Plaintiff does

5    not have access to the same information upon which Defendants relied to make their determination

6    and can only infer that the Defendants made the determination in good faith, based on reliable

7    information and in compliance with ERISA.

8            114.    However, alternatively and based on the limited information it has, Plaintiff has

9    identified another Dow Jones target risk index that has a lower allocation to equity securities and

10   appears to be more in line with the Moderate Fund equity allocation: the Dow Jones U.S.

11   Moderately Aggressive Target Risk Index ("DJ Moderately Aggressive Risk Index").

12           115.    The DJ Moderately Aggressive Risk Index maintains an allocation of stocks, bonds,

13   and cash asset classes in a portfolio equal to 80% of the risk associated with a portfolio invested

14   solely in stocks. Its asset allocation is similar to the asset allocation of the Moderate Fund. Within

15   the Index, bonds include U.S. government bonds, corporate bonds, mortgage-backed bonds, and

16   non-U.S. bonds. Cash is represented by the 90-Day T-Bill Average. The equity asset classes

17   include large-cap, mid-cap and small-cap stocks.

18           116.    The primary risk associated with the DJ Moderately Aggressive Risk Index is its

19   moderately aggressive allocation to equity securities. The potential reward of the DJ Moderately

20   Aggressive Risk Index is to maximize its returns consistent with its risk level.

21           117.    The Moderate Fund and the DJ Moderately Aggressive Risk Index also have similar

22   risks stemming from their investments in large, mid, small, and fixed income asset classes.  Both

23   the Moderate Fund and the Index thereby have similar market, allocation, fixed income, and

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

large-, mid- and small-cap risks.

118.    Based on these similarities, the DJ Moderately Aggressive Risk Index is a meaningful benchmark.

### iii. Moderate Fund Benchmark 2: Defendants' Custom Moderate Index

119.    In their Motion to Dismiss, Defendant stated that, according to their marketing materials, Unified used a Custom Moderate Index as a comparator for investors to evaluate the performance of the Moderate Fund. Defendants cannot now claim the opposite. In addition, Plaintiff's analysis of the Custom Moderate Index's portfolio holdings indicates that it is sufficiently similar to the Moderate Fund to serve as an appropriate benchmark.

120.    Milliman Financial Risk Management LLC and Unified Trust Company specifically developed the Custom Moderate Index as a meaningful benchmark to allow investors to evaluate the Moderate Funds' performance. Since December 17, 2014, the Custom Moderate Index has been a weighted blend of the following market indexes: (1) the Bank of America Merrill Lynch 3-Month U.S. Treasury Bill Index (8%), (2) the Barclays Capital U.S. Aggregate Index (22%), (3) the S&P 500 Index (48%), (4) the S&P MidCap 400 Index (9%), (5) the Russell 2000 Index (4%), and (6) the FTSE Global All Cap ex U.S. Index (9%).

121.    As illustrated in the chart below, the December 31, 2021 Moderate Fund Fact Sheet shows the asset allocation of the Moderate Fund closely resembles the asset allocation of its corresponding Custom Moderate Index.

| Asset Class | Moderate Fund | Custom Moderate Index |
|---|---|---|
| Fixed Income | 21.62% | 22% |
| Large Cap | 48.91% | 48% |
| Mid Cap | 8.88% | 9% |
| Small Cap | 3.80% | 4% |
| International | 8.72% | 9% |
| Cash and Equivalent | 8.07% | 8% |
| Net Futures Position | 5.41% | N/A |

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 27

122.    Although the Court asked Plaintiff to show that the meaningful benchmarks share similar aims, risks, and potential rewards, the Custom Moderate Index shares not just similar aims, risks and potential rewards, but nearly identical aims, risks, and potential rewards with the Moderate Fund. Accordingly, the Custom Moderate Index is a meaningful benchmark.

### iv. Moderate Fund Benchmark 3: The Morningstar Moderately Aggressive Target Risk Index

123.    Morningstar created the Morningstar Moderately Aggressive Target Risk Index specifically as a benchmark against which to compare the investment performance of any given fund in the Morningstar Allocation 70% to 85% Equity Category.

124.    Following the same process described in Paragraphs 85 – 90 above, which accounted for the aims, risks, and potential rewards of the funds, Morningstar assigned the Moderate Fund to the Morningstar Allocation 70% to 85% Equity Category because the Fund invests between 70% and 80% of its assets in equity securities. Morningstar states that funds in this category "seek to provide both income and capital appreciation by investing in multiple asset classes, including stocks, bonds, and cash." Like the Moderate Fund, funds in this category are "dominated by domestic holdings and have equity exposures between 70% and 85%." This Morningstar 70% to 85% Allocation Category coincides with the asset allocation description that the Milliman Plan applied to the Moderate Fund (i.e., allocation of 70% to 85% to equities) in the 2021 Fee Disclosure Notice to participants.

125.    For benchmarking purposes, Morningstar assigns the Morningstar Moderately Aggressive Target Risk Index to funds in the Morningstar 70% to 85% Equity Allocation Category because, in Morningstar's evaluation, they have similar underlying holdings.

Byrnes ◆ Keller ◆ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington 98104
(206) 622-2000

126.    Like the Moderate Fund, the Moderately Aggressive Target Risk Index allocates to large-, mid- and small-cap funds, international funds and bond funds.  Expectedly, Morningstar assigns the Morningstar Moderately Aggressive Target Risk Index as the appropriate benchmark for the Moderate Fund.

127.    By maintaining an asset allocation similar to the Morningstar Moderately Aggressive Target Risk Index, the Moderate Fund shares similar aims, risk, and potential rewards with its Morningstar Index.

### v. Moderate Fund Benchmark 4 and 5: Comparator Funds

### a. Benchmark 4: Alerus Moderate Growth Institutional Fund

128.    The Alerus Moderate Growth Institutional Fund ("Alerus Moderate Fund") has similar aims, risks, and rewards to the Moderate Fund. The Alerus Moderate Fund is a target risk fund and seeks returns commensurate with its asset allocation and risk. This Alerus Fund allocates between 65-80% of its assets to equity securities. While the Alerus Moderate Fund does not have a volatility target, *per se*, as of July 31, 2022, its historical volatility is 10.25%, which is in line with the Moderate Fund's 10% volatility target.

129.    To achieve its aims, the Alerus Moderate Fund is diversified across asset classes. Like the Moderate Fund, it invests in exchange traded funds and mutual funds and primarily utilizes indexed investments. It is structured as a fund of funds.

130.    The potential rewards of the Alerus Moderate Fund are that it will outperform other comparator funds with similar asset allocations, like the Moderate Fund. The Alerus Moderate Fund is also in the Morningstar Allocation 70% to 85% Equity Category, and like the Moderate Fund, it also aims to outperform other funds in that Morningstar Category and the Morningstar Moderately Aggressive Target Risk Index.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

131.    Like the Moderate Fund, the Alerus Moderate Fund's primary risk is due to its moderately aggressive allocation to equity securities. Historically, the Alerus Moderate Fund has allocated approximately 72% to equity securities, which is similar to the approximately 70% that the Moderate Fund allocates to equity securities. Like the Moderate Fund, the Alerus Moderate Fund has divided its equity allocations among large-cap, mid-cap, small-cap and international assets. The Alerus Moderate Growth Fund has invested approximately 28% in bonds and short-term investment vehicles, as compared to the Moderate Fund's 30% allocation.

132.    Like the Moderate Fund, the Alerus Fund also has market risk, allocation risk, fund of funds risk, and large-cap, small-cap, mid-cap, international, and fixed income risks.

133.    Given the similarities in portfolio composition, the aims, risks and potential rewards of both funds are similar.

### b. Benchmark 5: Mission Square MP Long-Term Growth R3

134.    The Mission Square MP Long-Term Growth R3 Fund ("Mission Square Fund") has similar aims, risks, and rewards as the Moderate Fund. The Mission Square Fund is a target risk fund and seeks to provide high long-capital growth and modest current income. While it does not have a volatility target, *per* se, as of July 31, 2022, the Mission Square Fund's historical volatility is 11.27%.

135.    To achieve its aims, the Mission Square Fund is diversified across asset classes. It invests in a combination of mutual funds and third-party ETFs. Like the Moderate Fund, it is structured as a fund of funds.

136.    The potential rewards of the Mission Square Fund, like the Moderate Fund, are that it will outperform its benchmark and other comparator funds. The Mission Square Fund is also in the Morningstar Allocation 70% to 85% Equity Category and has the same potential reward as the

Moderate Fund of beating other funds in that Morningstar Category and the Morningstar Moderately Aggressive Target Risk Index.

137.    Like the Moderate Fund, the Mission Square Fund's primary risk is due to its moderately aggressive allocation to equity securities. The fund seeks to have 77% equity and 16% fixed income exposure, with the remaining in multi-strategy investments (i.e., other funds that invest in multiple asset classes like equity, fixed income, and stocks), which is in line with the Moderate Fund's disclosed target equity allocation of between 70% and 85%. As of May 31, 2022, the Mission Square Fund's allocations have closely tracked its targeted allocations. Further, like the Moderate Fund, the Mission Square Fund invests its equity allocation in large-cap, mid-cap, small-cap, and international assets.

138.    Like the Moderate Fund, the Mission Square Fund also has market risk, allocation risk, fund of funds risk, and large-cap, small-cap, mid-cap, international, and fixed income risks.

139.    Given the similarities in portfolio composition, the aims, risks, and rewards of both funds are similar.

## C.  Conservative Fund and Its Benchmarks

### i. The Conservative Fund

140.    The Conservative Fund is a fund in the Wealth Preservation Target Risk Funds suite co-managed by Defendants and Unified. The Conservative Fund's aim is to seek capital growth and income consistent with its current asset allocation. The Conservative Fund has a volatility target of 8%; however, that target was not a fundamental investment policy and Unified could deviate from it at will. In fact, Unified and Milliman offer the following disclaimer in the Conservative Fund's pitch materials: "There is no guarantee that the fund will meet its volatility target objectives. Both the Fund's volatility target and asset allocation may be changed without

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

the prior consent of participant investors and at the sole discretion of the Fund's Trustee."

141.    To achieve its aims, the Conservative Fund is diversified across asset and sub-asset classes. It is designed to track the performance of broad market indexes, and exchange traded futures contracts. It is structured as a fund of funds.

142.    The Conservative Fund's potential rewards were to outperform other comparator funds and beat its relevant benchmarks.

143.    The Conservative Fund's risk stems from its moderate allocations to equity securities and fixed income assets. The 2021 Plan's Fee Disclosure Notice to Plan participants lists the Conservative Fund's equity allocation at between 50% and 70%. According to its December 31, 2021 Fact Sheet, the Conservative Fund allocated approximately 50% to equity securities, which is divided among large-cap, mid-cap, small-cap and international assets. About 50% of its portfolio was invested in fixed income securities and other short-term investments.

144.    Accordingly, the Conservative Fund's principal risks were related to (1) market risk, (2) fixed income risk; (3) allocation risk, and (4) the risk associated with investing in large-, small- and mid-cap stocks, and international stocks. Also, the Moderate Fund, as a fund of funds, was exposed to a fund of funds risk.

**ii. Conservative Fund Benchmark 1: The Dow Jones U.S. Moderate Target Risk Index**

145.    As discussed above, ERISA requires fiduciaries of a defined contribution plan to disclose to each participant an appropriate broad-based securities market index. In the 2021 Participant Fee Disclosure Notice, Defendants disclosed to the Plan participants that the Conservative Fund was benchmarked to the Dow Jones U.S. Moderate Target Risk Index ("DJ Moderate Risk Index"). Defendants stated it provided this benchmarking information to the Plan

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 32

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

participants to "show[] how the[] option[] ha[s] performed over time" and to allow the participant "to compare [the option] with an appropriate benchmark for the same time periods." Defendants did not offer another benchmark for the Conservative Fund in the disclosure notice to Plan participants.

146.    The DJ Moderate Risk Index maintains an allocation of stocks, bonds, and short-term instruments in a portfolio equal to 60% of the risk associated with the U.S. equities markets. Its asset allocation is similar to the asset allocation of the Moderate Fund. Within the Index, fixed income securities include U.S. government bonds, corporate bonds, mortgage-backed bonds and non-U.S. bonds. Short-term instruments are represented by the 90-Day T-Bill average. The equity asset classes are large-cap, mid-cap and small-cap stocks.

147.    By disclosing the DJ Moderate Risk Index to Plan participants as the appropriate benchmark for the Moderate Fund, the Defendants necessarily concluded that the Dow Jones Aggressive Target Risk Index was, in fact, "representative of the investment option" and thus shared similar aims, risks and rewards. Otherwise, to have disclosed an inaccurate or inappropriate benchmark to Plan participants could constitute a breach of fiduciary duty under ERISA. Defendants cannot now claim the DJ Moderate Risk Index is not a meaningful benchmark for the Conservative Fund.

148.    Moreover, given that the DJ Moderate Risk Index does, in fact, have similar aims, risks, and rewards by virtue of its asset allocations, the Dow Jones U.S. Moderate Target Risk Index represents a meaningful benchmark for the Conservative Fund.

### iii. Conservative Fund Benchmark 2: Defendants' Custom Conservative Index.

149.    In their Motion to Dismiss, Defendants stated that, according to the Conservative Fund's marketing materials, Unified used a Custom Conservative Index as an appropriate

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

benchmark to evaluate the performance of the Conservative Fund. Defendants cannot now claim the opposite. In addition, Plaintiff's analysis of the Custom Conservative Index indicates that it is sufficiently similar to the Conservative Fund to serve as an appropriate benchmark.

150.    The Fund advisers Milliman Financial Risk Management LLC and Unified Trust Company specifically developed the Custom Conservative Index as a benchmark to evaluate the Moderate Funds' performance. Since December 17, 2014, the Custom Conservative Index consists of a blend of 8% Bank of America Merrill Lynch US T-Bill 3-Month, 42% Barclays Capital US Aggregate Index, 35% S&P 500 Index, 6% S&P MidCap 400 Index, 2% Russell 2000 Index, and 7% FTSE Global All Cap ex U.S. Index.

151.    As illustrated in the chart below, the current asset allocation of the Conservative Fund closely resembles the asset allocation of its corresponding Custom Conservative Index.

| Asset Class | Conservative Fund | Custom Conservative Index |
|---|---|---|
| Fixed Income | 41.51% | 42% |
| Large Cap | 35.86% | 35% |
| Mid Cap | 5.95% | 6% |
| Small Cap | 1.91% | 2% |
| International | 6.82% | 7% |
| Cash and Equivalent | 7.95% | 8% |
| Net Futures Position | 3.36% | N/A |

152.    Although the Court asked Plaintiff to show that the meaningful benchmarks share similar aims, risks, and potential rewards, the Custom Conservative Index shares not just similar aims, risks, and potential rewards, but almost identical aims, risks, and potential rewards with the Conservative Fund. Accordingly, the Custom Conservative Index is a meaningful benchmark.

### iv. Conservative Fund Benchmark 3: The Morningstar Moderate Target Risk Index

153.    Morningstar created the Morningstar Moderate Target Risk Index specifically as a benchmark against which to compare the investment performance of any given fund in the

Morningstar Allocation 50% to 70% Equity Category.

154.     Following the same process described in Paragraphs 85 – 90 above, which accounted for the aims, risks, and potential rewards of the funds, Morningstar assigned the Conservative Fund to the Morningstar Allocation 50% to 70% Equity Catergory. Morningstar states that funds in this category "seek to provide both income and capital appreciation by investing in multiple asset classes, including stocks, bonds, and cash." Like the Conservative Fund, the portfolios of funds in this Category are "dominated by domestic holdings and have equity exposures between 50% and 70%." This Morningstar Category also coincides with the same asset class category that the Milliman Plan also applied to the Conservative Fund (i.e., allocation between 50% to 70% to equities) in the 2021 Fee Disclosure Notice to Plan participants.

155.     For benchmarking purposes, Morningstar assigns the Morningstar Moderate Risk Target Risk Index to the funds in the Morningstar 50% to 70% Equity Allocation Category because, in Morningstar's evaluation, they have similar underlying holdings.

156.     Like the Conservative Fund, the Morningstar Moderate Target Risk Index also allocates to large-, mid- and small-cap funds, international funds and bond funds. Expectedly, Morningstar assigns the Morningstar Moderate Target Risk Index as the appropriate benchmark for the Conservative Fund.

157.     By maintaining an asset allocation similar to the Morningstar Moderate Target Risk Index, the Conservative Fund shares similar aims, risks, and potential rewards with its Morningstar Index and the Morningstar Moderate Target Risk Index represents a meaningful comparator to funds with equity exposures of between 50 and 70% and with dominant allocations to domestic holdings.

### v. Moderate Fund Benchmark 4 and 5: Comparator Funds

### a. Benchmark 4: Benefit FCI Life Strategy Moderate Growth Fund

158.    The Benefit FCI Life Strategy Moderate Growth Fund ("Benefit FCI Fund") has similar aims, risks, and rewards as the Conservative Fund. The Benefit FCI Fund is a target risk fund and seeks to provide long-term capital appreciation balanced with income. While it does not have a volatility target, *per se*, as of July 31, 2022, the Benefit FCI Fund's historical volatility is 7.85%, which is similar to the Conservative Fund's 8% volatility target.

159.    To achieve its aims, the Benefit FCI Fund is diversified across asset classes. It invests in mutual funds, exchange traded funds, and/or collective investments. Like the Conservative Fund, it is structured as a fund of funds.

160.    The potential rewards of the Benefit FCI Fund, like the Conservative Fund, is that it will outperform its benchmark and other comparator funds. The Benefit FCI Fund is also in the Morningstar Allocation 50% to 70% Equity Category, and thus, it has the same potential reward as the Conservative Fund of beating other funds in that Morningstar Category and beating the Morningstar Moderate Target Risk Index.

161.    The Benefit FCI Fund's primary risks are spread across its equity and fixed income asset class allocations. Normally, the fund is expected to have 50% of the portfolio invested in equities and 47% in fixed income and cash equivalents. As of May 31, 2022, the Benefit FCI Fund allocated approximately 49% to equity securities, which is similar to the Conservative Fund's approximately 50% allocation. And the Benefit FCI Fund's approximate 49% allocations to fixed income and cash is similar to the Conservative Fund's 50% allocation. Like the Conservative Fund, it also invested in large-cap, mid-cap, small-cap and international funds.

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 36

BYRNES ◆ KELLER ◆ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

162.     Like the Conservative Fund, the Benefit FCI Fund's principal risks were related to market risk, fixed income risk, allocation risk, the risk associated with investing in large-, small-, mid-cap stocks, and international stocks. It also had a fund of funds risk.

163.     Given the similarities in portfolio composition, the aims, risks, and rewards of both funds are similar.

### b. Benchmark 5: Alerus Conservative Growth Institutional Fund

164.     The Alerus Conservating Growth Institutional Fund ("Alerus Conservative Fund"), a target risk fund, has similar aims, risks, and rewards to the Conservative Fund. The Alerus Conservative Fund seeks returns commensurate with its asset allocation and risk. Similar to the Conservative Fund, the Alerus Conservative Fund allocates between 50-65% of its assets to equity securities. While the Alerus Conservative Fund does not have a volatility target, *per se*, as of July 31, 2022, its historical volatility is 8.5%, which is in line with the Conservative Fund's 8% volatility target.

165.     To achieve its aims, the Alerus Conservative Fund is diversified across asset classes. Like the Conservative Fund, it invests in exchange traded funds and mutual funds and primarily utilizes indexed investments. It is structured as a fund of funds.

166.     The potential rewards of the Alerus Conservative Fund are that it will outperform other comparator funds with similar asset allocations, like the Conservative Fund. The Alerus Conservative Fund is in the Morningstar Allocation 50% to 70% Equity Category and, therefore, also aims to outperform other funds in that Morningstar Category and the Morningstar Moderate Target Risk Index.

167.     The Alerus Conservative Fund's risks are from both its equities and fixed income allocations. Historically, the Alerus Conservative Fund has allocated approximately 60% to equity

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 37

Byrnes ♦ Keller ♦ Cromwell llp
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

securities, which is in line with the Conservative Fund's allocation. Like the Conservative Fund, the Alerus Conservative Fund invested its equity allocations in large-cap, mid-cap, small-cap and international assets. The Alerus Conservative Fund has invested approximately 39% in bonds and short-term investment vehicles, compared to the Conservative Fund's 50% allocation.

168.    Like the Conservative Fund, the Alerus Conservative Fund's principal risks were related to market risk, fixed income risk, allocation risk, the risk associated with investing in large-, small-, mid-cap stocks and international stocks. It also had a fund of funds risk.

169.     Given the similarities in portfolio composition, the aims, risks, and potential rewards of both funds are directly similar.

## VIII.   MILLIMAN BREACHES

### A.  The Milliman Defendants Imprudently Retained the Unified Funds

170.    The Milliman Defendants first selected and included the Unified Funds in the Plan during 2013. By the end of 2013, Plan participants had invested over $180 million in the three Unified Funds.

171.    Notably, according to DOL filings, by the end of 2013 the Plan was the sole investor in the Moderate and Conservative Funds and comprised about 97% of the assets of the Aggressive Fund. As of December 31, 2020, no other plan fiduciary managing a like-size plan has chosen to offer the Unified Funds to its participants.

172.    Post-selection, the Milliman Defendants were required by law to monitor the funds with the skill of a prudent expert to determine whether their investment performance remained in line with a meaningful investment index and funds within a recognized peer universe.

173.    For a prudent fiduciary, investment options that, on average, underperform their benchmarks or peer universe over rolling 3- or 5-year periods are candidates for removal.

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 38

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Typically, such guidelines are outlined in a plan's investment policy statement or in a pension consultant's recommendations.

174.    Had the Milliman Defendants fulfilled their duty with the care and skill of a prudent fiduciary, they would have seen in real-time that the Aggressive Fund, the Moderate Fund, and the Conservative Fund had significantly underperformed the Dow Jones Target Risk Indexes for at least three years prior to the commencement of the Class Period.

175.    In the three-year period from 2013 through 2015, the poor performance of the three Unified Funds cost the Plan and its participants over $50 million in lost retirement savings when compared to the performance of their respective Dow Jones Target Risk Indexes.

176.    Any fiduciary properly monitoring the Plan would have seen that the poor performance warranted the selection of new target risk options.

177.    Despite the financial rout, Milliman continued its commitment to the Unified Funds. For reasons that defy any prudent explanation, Milliman failed to replace any of the Unified Funds with any one of the many prudent alternatives.

178.    Not unexpectedly, each Unified Fund has continued to languish at the bottom of its respective peer universe, capping nearly a decade of continuous poor performance.

179.    **Tables 1.a, 2.a, and 3.a** below demonstrate the underperformance of each Unified Fund compared to the Dow Jones Target Risk Indexes, Morningstar Target Risk Indexes, and the Comparator Funds for the three-year period prior to the Class Period, i.e., from January 1, 2013, through December 31, 2015.

180.    **Tables 1.b, 2.b, and 3.b** below demonstrate the underperformance of each Unified Fund compared to Dow Jones Target Risk Indexes, the Custom Indexes, Morningstar Target Risk

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Indexes, and the Comparator Funds on both an annualized and cumulative basis for the Class Period, i.e., from January 1, 2016, through July 31, 2022.

181.     The annualized performance numbers in **Tables 1.b, 2.b, and 3.b** highlight the woeful underperformance of the Unified Funds. When the Unified Funds occasionally outperform their stated benchmarks, the outperformance is marginal. But when the Unified Funds frequently underperform their stated benchmarks, the underperformance is staggering. In numerous years the Unified Funds have underperformed their benchmarks by over 500 basis points. The significance of this underperformance is captured by the cumulative numbers in these tables.

182.     Together, **Tables 1.a and 1.b, 2.a and 2.b, and 3.a and 3.b** demonstrate that the substantial underperformance of the Unified Funds relative to meaningful benchmarks has persisted for a nine-year period – nearly a decade of unabated imprudence.

183.     **Tables 1.c., 2.c, and 3.c** below quantify how Milliman's decision to retain the Unified Funds squandered millions of dollars of Plan participants' retirement savings. Plaintiff demonstrates the monetary impact of Milliman's decision by showing how the growth of an investment in each Unified Fund compares to the growth of the three Indexes and the respective Comparator Funds from January 1, 2016, through July 31, 2022.

184.     All the data presented in each of the Tables in this Complaint was available in real-time to the Milliman Defendants throughout the Class Period.

185.     The Comparator Funds listed in each of the Tables below are managed by reputable banks and investment advisers and are available to all large retirement plans, including Milliman's Plan. The Milliman Defendants would not have had to scour the market to find them. On the contrary, the Unified Funds' performance was so bad that the Milliman Defendants likely would have had to scour the market to find offerings as poorly performing as the Unified Funds.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

186.    The overall depth of the Unified Funds' underperformance raises a plausible inference that Milliman's monitoring process was tainted by a lack of competency and/or complete failure of effort.

187.    Plaintiff did not have knowledge of all material facts necessary to understand that the Milliman Defendants breached their fiduciary duties until shortly before filing the Complaint. Further, Plaintiff does not have actual knowledge of the specifics of the Defendants' decision-making processes with respect to the Plan, including the processes for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of the Defendants at present. For purposes of this Complaint, Plaintiff has drawn reasonable and plausible inferences regarding these processes based upon the facts alleged in this Complaint.

### i. Aggressive Fund

188.    Since its introduction to the Plan in 2013, the Aggressive Fund's underperformance has undermined the retirement savings of Plan participants. **Table 1.a** below illustrates three years of underperformance from January 1, 2013, through December 31, 2015, relative to the Dow Jones and Morningstar benchmarks and the Comparator Funds. Comparison to the Custom Growth Index is not shown because Defendants did not track the Index until calendar year 2015.

**Table 1.a**

| Investment Name | Cumulative Return | Annualized Return |
|---|---|---|
| Aggressive Fund | 19.02% | 5.98% |
| | | |
| DJ Aggressive Risk Index | 47.91% | 13.94% |
| | | |

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 41

| Investment Name | Cumulative Return | Annualized Return |
|---|---|---|
| Morningstar Aggressive Target Risk Index | 27.54% | 8.45% |
| | | |
| Alerus Aggressive Fund | 27.43% | 8.41% |
| | | |
| Transamerica Horizon Fund | 37.03% | 11.07% |

189.     Prudent fiduciaries would have used one or more of the benchmarks listed in **Table 1.a** to evaluate the performance of the Aggressive Fund. At the end of 2015, the Milliman Defendants would have seen that the Aggressive Fund had underperformed the DJ Aggressive Risk Index every single year for a cumulative total of almost 29%. Comparing the best performing fund among the Comparator Funds, the fiduciaries would have seen that the Aggressive Fund's cumulative underperformance exceeded 18%. Despite this dreadful underperformance, the Milliman Defendants did not remove the Aggressive Fund from the Plan. Predictably, the fund's underperformance continued throughout the Class Period.

190.     **Table 1.b** illustrates the underperformance of the Aggressive Fund from January 1, 2016, through December 31, 2021, on an annualized and cumulative basis relative to the Indexes and Comparator Funds. The Aggressive Fund underperformed the DJ Aggressive Risk Index every single calendar year except 2018 and 2017, the Custom Growth Index every single calendar year except 2017, and the Morningstar Aggressive Target Risk Index every single calendar year except 2018.

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 42

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

**Table 1.b**

| Investment Name | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | July 31, 2022 | Cumulative |
|---|---|---|---|---|---|---|---|---|
| Aggressive Fund | 4.92% | 20.16% | -6.18% | 18.16% | 6.10% | 15.87% | -10.93% | 53.03% |
| DJ Aggressive Risk Index | 13.48% | 20.16% | -7.41% | 30.33% | 17.41% | 25.49% | -12.85% | 111.26% |
| +/- Aggressive Fund | -8.56% | 0.00% | 1.23% | -12.17% | -11.31% | -9.62% | 1.92% | -58.23% |
| Custom Growth Index | 11.01% | 18.36% | -5.76% | 25.31% | 16.11% | 20.40% | -11.45% | 92.07% |
| +/- Aggressive Fund | -6.09% | 1.80% | -0.42% | -7.15% | -10.01% | -4.53% | 0.52% | -39.04% |
| Morningstar Aggressive Target Risk Index | 11.33% | 21.95% | -8.17% | 25.91% | 13.26% | 17.30% | -13.60% | 80.19% |
| +/- Aggressive Fund | -6.41% | -1.79% | 1.99% | -7.75% | -7.16% | -1.43% | 2.67% | -27.16% |
| Alerus Aggressive Fund | 10.97% | 19.24% | -8.11% | 25.39% | 15.73% | 18.91% | -13.78% | 80.88% |
| +/- Aggressive Fund | -6.05% | 0.92% | 1.93% | -7.23% | -9.63% | -3.04% | 2.85% | -27.85% |

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 43

| Investment Name | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | July 31, 2022 | Cumulative |
|---|---|---|---|---|---|---|---|---|
| Transamerica Horizon Fund | 8.23% | 20.01% | -8.03% | 26.31% | 22.77% | 16.96% | -16.09% | 81.80% |
| +/- Aggressive Fund | -3.31% | 0.15% | 1.85% | -8.15% | -16.67% | -1.09% | 5.16% | -28.77% |

191.     When compared to the investment performance of the Plan's stated benchmark, the DJ Aggressive Risk Index, the breadth of the Aggressive Fund's underperformance exemplifies another complete failure of Milliman's fiduciary process. Based on Morningstar data, as of July 31, 2022, the Aggressive Fund cumulatively underperformed by over 58 percentage points. The significance of the underperformance is outstanding. It underperformed by more than 8.5 percentage points in 2016, over 12 percentage points in 2019, over 11 percentage points in 2020, and over 9.6 percentage points in 2021.

192.     In their Motion to Dismiss, Defendants try to create the narrative that the Aggressive Fund had significantly outperformed the Custom Growth Index on a 3-month, 1-year, and 3-year cumulative basis. Defendants hand-picked the date of March 31, 2020 to hide the Fund's long-term abysmal performance with one quarter of fleeting outperformance. Dkt. No. 34-1, Ex. 3. Excluding the performance of Q1 2021 reveals a darker narrative.

193.     In the three quarters ending December 31, 2019, the Aggressive Fund underperformed the Custom Growth Index by a margin of 12.10% versus 10.07%. In the prior two years and three quarters, the Aggressive Fund underperformed the Custom Growth Index by a margin of 10.87% versus 8.80% per annum. In the prior four years and three quarters, the

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 44

Aggressive Fund underperformed the Custom Growth Index by a margin of 9.20% versus 5.92% per annum. Despite its stellar Q1 2020 performance, the Aggressive Fund underperformed every single benchmark in 2020 by a wide margin, as **Table 1.b**. illustrates.

194.    During the Class Period, the assets of the Aggressive Fund averaged approximately $75 million. **Table 1.c** demonstrates the financial significance of this underperformance by showing the growth of $75 million invested in the Aggressive Fund as compared to the growth of $75 million invested in each of the Indexes and Comparator Funds from January 1, 2016, through July 31, 2022.

**Table 1.c**

| Investment Name | Cumulative Return | Annualized Return | Ending Value |
|---|---|---|---|
| Aggressive Fund | 53.03% | 6.68% | $   114,774,536.26 |
| | | | |
| DJ Aggressive Risk Index | 111.26% | 12.03% | $   158,444,433.45 |
| | | | |
| Custom Growth Index | 92.07% | 10.56% | $   144,051,051.01 |
| | | | |
| Morningstar Aggressive Target Risk Index | 80.19% | 9.36% | $   135,139,814.26 |
| Alerus Aggressive Fund | 80.88% | 9.42% | $   135,659,969.34 |
| | | | |
| Transamerica Horizon Fund | 81.80% | 9.50% | $   136,353,416.99 |

### ii. Moderate Fund

195.    Since its introduction to the Plan in 2013, the Moderate Fund's underperformance has also undermined the retirement savings of Plan participants. **Table 2.a** below illustrates three

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 45

years of underperformance from January 1, 2013, leading up to the beginning of the Class Period on December 31, 2015, relative to benchmark indexes and the Comparator Funds. Comparison to the Custom Moderate Index is not shown because Defendants did not track the Index until calendar year 2015.

**Table 2.a**

| Investment Name | Cumulative Return | Annualized Return |
|---|---|---|
| Moderate Fund | 20.51% | 6.42% |
| | | |
| DJ Aggressive Risk Index | 47.91% | 13.94% |
| | | |
| DJ Moderately Aggressive Risk Index | 38.69% | 11.52% |
| | | |
| Morningstar Moderately Aggressive Target Risk Index | 23.12% | 7.18% |
| **Investment Name** | **Cumulative Return** | **Annualized Return** |
| Alerus Moderate Fund | 25.39% | 7.83% |
| | | |
| Mission Square Fund | 24.66% | 7.62% |

196.    Prudent fiduciaries would have used one or more of the benchmarks listed in **Table 2.a** to evaluate the performance of the Moderate Fund. At the end of the three-year period, the Milliman Defendants would have seen that the Moderate Fund had underperformed the Dow Jones Aggressive Target Risk Index, the benchmark identified in the 2021 Fee Disclosure Notice, every single year for a cumulative underperformance total of over 27%. Compared to the best performing fund among the Comparator Funds, the underperformance exceeded 4.8%. Despite this dreadful

underperformance, the Milliman Defendants did not remove the Moderate Fund from the Plan. Predictably, the fund's underperformance continued throughout the Class Period.

197.   **Table 2.b** illustrates the underperformance of the Moderate Fund from January 1, 2016, through December 31, 2021, on an annualized and cumulative basis relative to Comparator Funds and the Morningstar Benchmark Index. Like the Aggressive Fund, the Moderate Fund underperformed its Custom Moderate Index every single calendar year except 2018, which represents five of six years of underperformance relative to its custom benchmark. Furthermore, the differences in annual performance are even more pronounced when viewed on a cumulative basis compounded over time.

**Table 2.b**

| **Investment Name** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **July 31, 2022** | **Cumulative** |
|---|---|---|---|---|---|---|---|---|
| Moderate Fund | 6.27% | 17.24% | -5.42% | 19.63% | 8.15% | 13.94% | -11.02% | 54.56% |
| | | | | | | | | |
| DJ Aggressive Risk Index | 13.48% | 20.16% | -7.41% | 30.33% | 17.41% | 25.49% | -12.85% | 111.26% |
| +/- Moderate Fund | -7.21% | -2.92% | 1.99% | -10.70% | -9.26% | -11.55% | 1.83% | -56.70% |
| | | | | | | | | |
| DJ Moderately Aggressive Risk Index | 11.33% | 16.55% | -5.61% | 25.50% | 15.28% | 19.81% | -11.30% | 88.30% |
| +/- Moderate Fund | -5.06% | 0.69% | 0.19% | -5.87% | -7.13% | -5.87% | 0.28% | -33.74% |
| | | | | | | | | |

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 47

| Investment Name | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | July 31, 2022 | Cumulative |
|---|---|---|---|---|---|---|---|---|
| Custom Moderate Index | 9.46% | 15.62% | -4.42% | 22.34% | 15.23% | 16.64% | -10.62% | 77.79% |
| +/- Moderate Fund | -3.19% | 1.62% | -1.00% | -2.71% | -7.08% | -2.70% | -0.40% | -23.23% |
| Morningstar Moderately Aggressive Target Risk Index | 10.21% | 18.89% | -6.74% | 22.95% | 13.51% | 14.04% | -12.90% | 69.41% |
| +/- Moderate Fund | -3.94% | -1.65% | 1.32% | -3.32% | -5.36% | -0.10% | 1.88% | -14.85% |
| Alerus Moderate Fund | 9.53% | 15.54% | -6.37% | 21.51% | 15.62% | 14.75% | -12.30% | 67.52% |
| +/- Moderate Fund | -3.26% | 1.70% | 0.95% | -1.88% | -7.47% | -0.81% | 1.28% | -12.96% |
| Mission Square Fund | 7.82% | 17.88% | -7.70% | 22.80% | 13.69% | 17.32% | -12.25% | 68.61% |
| +/- Moderate Fund | -1.55% | -0.64% | 2.28% | -3.17% | -5.54% | -3.38% | 1.23% | -14.05% |

198.    When compared to the investment performance of the Plan's stated benchmark, the DJ Aggressive Risk Index, the breadth of the Moderate Fund's underperformance exemplifies another complete failure of Milliman's fiduciary process. Based on Morningstar data, as of July 31, 2022, the Moderate Fund cumulatively underperformed by over 56 percentage points, and performed worse in every full-calendar year except for 2018. The significance of the underperformance is outstanding. It underperformed by more than 7 percentage points in 2016,

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

almost 3 percentage points in 2017, over 10 percentage points in 2019, over 9 percentage points in 2020, and over 11.5 percentage points in 2021.

199.    In their Motion to Dismiss, Defendants try to create the narrative that the Moderate Fund had significantly outperformed the Custom Moderate Index on a 3-month, 1-year, and 3-year cumulative basis. Defendants hand-picked the date of March 31, 2020, to hide the Fund's long-term abysmal performance with one quarter of fleeting outperformance. Dkt. No. 34-1, Ex. 4. Excluding the performance of Q1 2020 reveals a darker narrative.

200.    In the three quarters ending December 31, 2019, the Fund underperformed the Custom Moderate Index by a margin of 11.14% versus 10.89%. In the prior two years and three quarters, the Moderate Fund underperformed the Custom Moderate Index by a margin of 9.84% versus 8.90% per annum. In the prior four years and three quarters, the Moderate Fund underperformed the Custom Moderate Index by a margin of 8.22% versus 6.45% per annum. Despite its stellar Q1 2020 performance, the Moderate Fund underperformed every single benchmark in 2020 by a wide margin, as **Table 2.b**. illustrates.

201.    During the Class Period, the assets of the Moderate Fund averaged approximately $85 million. **Table 2.c** demonstrates the financial significance of this underperformance by showing the growth of $85 million invested in the Moderate Fund as compared to the growth of $85 million invested in each of the benchmark indexes and Comparator Funds from January 1, 2016, through July 31, 2022.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

**Table 2.c**

| Investment Name | Cumulative Return | Annualized Return | Ending Value |
|---|---|---|---|
| Moderate Fund | 54.56% | 6.84% | $   131,376,210.90 |
| DJ Aggressive Risk Index | 111.26% | 12.03% | $   179,570,357.91 |
| DJ Moderately Aggressive Risk Index | 88.30% | 10.09% | $   160,056,936.75 |
| Custom Moderate Index | 77.79% | 9.26% | $   151,119,458.73 |
| Morningstar Moderately Aggressive Target Risk Index | 69.41% | 8.34% | $   143,999,266.66 |
| Alerus Moderate Fund | 67.52% | 8.15% | $   142,389,084.91 |
| Mission Square Fund | 68.61% | 8.26% | $   143,315,730.26 |

### iii. Conservative Fund

202. Since its introduction to the Plan in 2013, the Conservative Fund's underperformance has also undermined the retirement savings of Plan participants. **Table 3.a** below illustrates three years of underperformance from January 1, 2013, through December 31, 2015, relative to benchmark indexes and the Comparator Funds. Comparison to the Custom Conservative Index is not shown because Defendants did not track the Index until calendar year 2015.

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

**Table 3.a**

| **Investment Name** | **Cumulative Return** | **Annualized Return** |
|---|---|---|
| Conservative Fund | 17.62% | 5.56% |
| DJ Moderate Risk Index | 30.25% | 9.21% |
| Morningstar Moderate Target Risk Index | 17.75% | 5.60% |
| Alerus Conservative Fund | 21.69% | 6.77% |
| Benefit FCI Fund | 19.48% | 6.12% |

203.    Prudent fiduciaries would have used one or more of the benchmarks listed in **Table 3.a** to evaluate the performance of the Conservative Fund. At the end of the three-year period, the Milliman Defendants would have seen that its Conservative Fund had significantly underperformed its Dow Jones benchmark. It underperformed the Dow Jones Moderate Risk Index by 12.63%. Despite this dreadful underperformance, the Milliman Defendants did not remove the Conservative Fund from the Plan. Predictably, the fund's underperformance continued throughout the Class Period.

204.    **Table 3.b** illustrates the underperformance of the Conservative Fund from January 1, 2016, through December 31, 2021, on an annualized and cumulative basis relative to Comparator Funds and the benchmark indexes. As illustrated in **Table 3.b**, the Conservative Fund underperformed the Dow Jones benchmark every single calendar year, and underperformed the Custom Conservative Index and the Morningstar Moderate Target Risk Index in four of the six calendar years. Furthermore, the differences in annual performance are even more pronounced when viewed on a cumulative basis compounded over time.

Byrnes ♦ Keller ♦ Cromwell llp
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

**Table 3.b**

| Investment Name | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | July 31, 2022 | Cumulative |
|---|---|---|---|---|---|---|---|---|
| Conservative Fund | 6.69% | 12.94% | -4.10% | 18.39% | 8.99% | 10.72% | -10.34% | 48.03% |
| DJ Moderate Risk Index | 9.26% | 13.12% | -3.92% | 20.80% | 13.03% | 14.19% | -10.17% | 66.30% |
| +/- Conservative Fund | -2.57% | -0.18% | -0.18% | -2.41% | -4.04% | -3.47% | -0.17% | -18.27% |
| Custom Conservative Index | 7.30% | 12.12% | -2.96% | 18.24% | 13.42% | 11.30% | -9.65% | 57.43% |
| +/- Conservative Fund | -0.61% | 0.82% | -1.14% | 0.15% | -4.43% | -0.58% | -0.69% | -9.40% |
| Morningstar Moderate Target Risk Index | 8.57% | 14.66% | -4.76% | 19.03% | 12.82% | 10.19% | -11.64% | 55.03% |
| +/- Conservative Fund | -1.88% | -1.72% | 0.66% | -0.64% | -3.83% | 0.53% | 1.30% | -7.00% |
| Alerus Conservative Fund | 8.14% | 13.31% | -4.06% | 19.09% | 14.30% | 11.87% | -11.42% | 58.56% |
| +/- Conservative Fund | -1.45% | -0.37% | -0.04% | -0.70% | -5.31% | -1.15% | 1.08% | -10.53% |

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington  98104
(206) 622-2000

| Investment Name | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | July 31, 2022 | Cumulative |
|---|---|---|---|---|---|---|---|---|
| Benefit FCI Fund | 7.21% | 12.83% | -3.56% | 16.83% | 13.73% | 11.23% | -10.32% | 54.59% |
| +/- Conservative Fund | -0.52% | 0.11% | -0.54% | 1.56% | -4.74% | -0.51% | -0.02% | -6.56% |

205.    When compared to the investment performance of the Plan's stated benchmark, the DJ Moderate Risk Index, the breadth of the Conservative Fund's underperformance exemplifies another complete failure of Milliman's fiduciary process. Based on Morningstar data, as of July 31, 2022, the Conservative Fund cumulatively underperformed the Index by over 18 percentage points, and performed worse in every full-calendar year. The significance of the underperformance is outstanding. It underperformed by more than 2.5 percentage points in 2016, almost 2.5 percentage points in 2019, over 4 percentage points in 2020, over 9 percentage points in 2020, and almost 3.5 percentage points in 2021.

206.    In their Motion to Dismiss, Defendants try to create the narrative that the Conservative Fund had significantly outperformed the Custom Conservative Index on a 3-month, 1-year, and 3-year cumulative basis. Defendants hand-picked the date of March 31, 2020, to hide the Conservative Fund's long-term abysmal performance with one quarter of fleeting outperformance. Dkt. No 34-1, Ex. 5. Excluding the performance of Q1 2020 reveals a darker narrative.

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

207.   In the three quarters ending December 31, 2019, the Conservative Fund underperformed the Custom Conservative Index by a margin of 10.39% versus 9.74%. In the prior two years and three quarters, the Conservative Fund underperformed the Custom Conservative Index by a margin of 8.30% versus 8.00% per annum. In the prior four years and three quarters, the Conservative Fund underperformed the Custom Conservative Index by a margin of 6.76% versus 6.21% per annum. Despite its stellar Q1 2020 performance, the Conservative Fund underperformed every single benchmark in 2020, as illustrated in **Table 3.c**.

208.   During the Class Period, the assets of the Conservative Fund averaged approximately $40 million. **Table 3.c** demonstrates the financial significance of this underperformance by showing the growth of $40 million invested in the Conservative Fund as compared to the growth of $40 million invested in each of the benchmark indexes and Comparator Funds from January 1, 2016, through July 31, 2022.

**Table 3.c**

| Investment Name | Cumulative Return | Annualized Return | Ending Value |
|-----------------|-------------------|-------------------|--------------|
| Conservative Fund | 48.03% | 6.14% | $   59,213,362.78 |
| DJ Moderate Risk Index | 66.30% | 8.03% | $   66,521,955.72 |
| Custom Conservative Index | 57.43% | 7.23% | $   62,972,013.11 |
| Morningstar Moderate Target Risk Index | 55.03% | 6.89% | $   62,010,451.16 |
| Alerus Conservative Fund | 58.56% | 7.25% | $   63,425,732.77 |

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 54

| Investment Name | Cumulative Return | Annualized Return | Ending Value |
|---|---|---|---|
| Benefit FCI Fund | 54.59% | 6.84% | $   61,837,033.59 |

## IX.   CLASS ACTION ALLEGATIONS

209.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

210.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Specifically, Plaintiff seeks to certify, and to be appointed as representative of, the following class:

> All participants and beneficiaries of the Plan who invested in any of the Unified Funds from January 13, 2016, through the date of judgment, excluding the Milliman Defendants, any of their directors, and any officers or employees of the Milliman Defendants with responsibility for the Plan's investment or administrative function.

211.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes thousands of members and is so large that joinder of all its members is impracticable.

b.   There are numerous questions of law and fact common to this Class because the Milliman Defendants owed the same fiduciary duties to the Plan and to all participants and beneficiaries and took a common course of actions and omissions as alleged herein as to the Plan, and not as to any individual participant, that affected all Class members through their participation in the Plan in the same way. Thus, questions of law and fact common to the

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Class include, without limitation, the following: (i) whether each of the Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); (ii) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by employing an imprudent process for monitoring and evaluating Plan investment options; (iii) whether Plaintiff's claims of an imprudent process require similar inquiries and proof of the claims and therefore implicate the same set of concerns for all proposed members of the Class; (iv) what are the losses to the Plan resulting from each breach of fiduciary duty; and (v) what Plan-wide equitable and other relief the Court should impose in light of the Milliman Defendants' breach of duties.

c.  Plaintiff's claims are typical of the claims of the Class because Plaintiff was a participant during the Class Period and all participants in the Plan were harmed by the Milliman Defendants' misconduct.

d.  Plaintiff is an adequate representative of the Class because she participated in the Plan during the Class Period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

e.  There are no substantial individualized questions of law or fact among Class members on the merits of this Action.

212.  Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Milliman Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties, and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

213.    Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because the Milliman Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Plaintiff seeks reformation of the Plan to make it a more viable retirement investment option, which will benefit her and other Plan participants.

214.    Additionally, or in the alternative, this action may be certified as a class under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and it is impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

215.    Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to the Milliman Defendants' liability to the Class for their allegedly imprudent conduct.

216.    Plaintiff's counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 57

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## COUNT I

**Breach of Duties of Loyalty and Prudence by Mismanaging the Investment Options Selected for and Retained by the Plan During the Class Period**
**(Violation of ERISA, 29 U.S.C. § 1104)**

217.    The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

218.    At all relevant times during the Class Period, each of the Defendants acted as a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plan and its assets and/or was designated in the Plan Document as a named fiduciary within the meaning of 29 U.S.C. § 1102(a).

219.    29 U.S.C. § 1104(a)(1) requires plan fiduciaries to act "solely in the interest" of plan participants and beneficiaries.

a.    Subsection (A) of this section requires that the fiduciary act for the "exclusive purpose" of providing benefits to plan participants and defraying reasonable expenses of plan administration. 29 U.S.C. § 1104(a)(1)(A).

b.    Subsection (B) adds the duty of prudence, requiring a plan fiduciary to act with the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

220.    ERISA's duty of prudence required the Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. §2550.404a-1. The Supreme Court has concluded that this

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 58

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 575 U.S. at 529.

221.    As described above, the Defendants failed to properly evaluate the Plan's investments to ensure that each of these investments remained prudent and failed to remove the Unified Funds that were no longer prudent.

222.    During the Class Period, the Defendants had a conflict of interest when retaining the Unified Funds as investment options for the Plan. Acting in their self-interest, rather than the best interests of the Plan and its participants, the Defendants imprudently and disloyally retained investment options that performed poorly and that benefited Milliman affiliated entities, rather than Plan participants, despite the availability of superior – and readily available – investment alternatives as detailed herein. A prudent fiduciary, in possession of the same information, would have removed the Unified Funds as investment options in the Plan, replaced them with more prudent and better performing alternatives as well as used the size, leverage, and bargaining power of the Plan to secure access to superior investment alternatives for Plan participants.

223.    The Defendants breached their duties of prudence and loyalty with respect to the Plan by at least the following actions or omissions:

a.    failing to properly investigate the availability of, and give appropriate consideration to, funds with similar or superior performance as alternatives to the Unified Funds;

b.    failing to evaluate and monitor on a regular basis the performance of the Unified Funds and the adverse impact of the long-term and significant underperformance of the Unified Funds on participants' retirement savings;

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

c.      failing to implement and employ an ongoing process to monitor the investment performance of the Unified Funds;

d.      considering and being motivated in whole or in part by Milliman Financial Risk Management LLC's continuing role as sub-adviser for the Unified Funds' $250 million in assets; and

e.      failing to promptly remove the imprudent Unified Funds.

224.    Through these actions and omissions, the Defendants failed to discharge their duties with respect to the Plan: (A) solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); and (B) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

225.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and each of its participants have suffered hundreds of millions of dollars of damages and lost-opportunity costs which continue to accrue and for which Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109. Pursuant to ERISA, 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a), Defendants are liable to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

226.     Each of the Milliman Defendants is liable to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

227.     Each Milliman Defendant also participated in the breach of the other Milliman Defendants, knowing that such acts were a breach, and enabled the other Milliman Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties. Each Milliman Defendant knew of the breach by the other Milliman Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Milliman Defendant is liable for the losses caused by the breach of its co-fiduciary duties under 29 U.S.C. § 1105(a).

## <u>COUNT II</u>
### Failure to Monitor
### (Against All Milliman Defendants)

228.     All allegations set forth in the Complaint are realleged and incorporated herein by reference.

229.     The Defendants had a duty to monitor the performance of each individual to whom they delegated any fiduciary responsibilities. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

230.     To the extent any of the Defendants' fiduciary responsibilities were delegated to another fiduciary, the Defendants' monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

231.   The Defendants breached their fiduciary monitoring duties by, among other things:

    a.    failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

    b.    failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the imprudent investment options in violation of ERISA;

    c.    failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that the Unified Funds were prudent; and

    d.    failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to remain in the Plan to the detriment of Plan participants' retirement savings.

232.   Each fiduciary who delegated its fiduciary responsibilities likewise breached its fiduciary monitoring duty by, among other things:

    a.    failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

    b.    failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the imprudent investment options in violation of ERISA;

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

c.      failing to implement a process to ensure that the appointees monitored the performance of Plan investments; and

d.      failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to remain in the Plan, all to the detriment of Plan participants' retirement savings.

233.    As a direct result of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Milliman and the other delegating fiduciaries prudently discharged their fiduciary monitoring duties, the Plan would not have suffered these losses.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

i)      find and adjudge that the Milliman Defendants have breached their fiduciary duties, as described above;

ii)     find and adjudge that the Milliman Defendants are personally liable to make good to the Plan in losses to the Plan resulting from their breaches of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

iii)    find and adjudge that the Milliman Defendants are liable to the Plan for appropriate equitable relief, including but not limited to restitution and disgorgement;

iv)     determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

v)      order the Milliman Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C.§ 1109(a);

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

vi)   impose surcharge against the Milliman Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

vii)   reform the Plan to include only prudent investments;

viii)  certify the Class, appoint the Plaintiff as a class representative, and appoint Sanford Heisler Sharp, LLP as Class Counsel;

ix)   award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

x)   order the Milliman Defendants to pay interest to the extent allowed by law; and

xi)   grant such other equitable or remedial relief as the Court deems appropriate.

DATED this 15th day of August, 2022.


BYRNES KELLER CROMWELL LLP


By /s/ Paul R. Taylor
    Paul R. Taylor, WSBA #14851
    1000 Second Avenue, 38th Floor
    Seattle, Washington 98104
    Telephone: (206) 622-2000
    Facsimile: (206) 622-2522
    ptaylor@byrneskeller.com

    Charles Field*
    **SANFORD HEISLER SHARP, LLP**
    2550 Fifth Avenue, 11th Floor
    San Diego, CA 92103
    Telephone: (619) 577-4253
    Facsimile: (619) 577-4250
    cfield@sanfordheisler.com
    yparray@sanfordheisler.com

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 64

BYRNES ◆ KELLER ◆ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Johan Conrod*
Shaun Rosenthal*
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5200
Facsimile: (202) 499-5199
jconrod@sanfordheisler.com
srosenthal@sanfordheisler.com

*admitted pro hac vice*
*Attorneys for Plaintiffs and the Proposed Class*

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 65

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 15th day of August, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

/s/ Paul R. Taylor
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA  98104
Telephone:  (206) 622-2000
Facsimile:  (206) 622-2522
ptaylor@byrneskeller.com

FIRST AMENDED COMPLAINT – CLASS ACTION
(NO. 2:22-cv-00037-TSZ) - 66