1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

JOANNA P. MATTSON, on behalf of
herself and all others similarly situated,

Plaintiffs,

v.

MILLIMAN, INC.,

Defendant.

C22-0037 TSZ

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

13

14

15

16

THIS MATTER came before the Court for a bench trial held from April 1 through
April 10, 2024.  Plaintiff Joanna Mattson and the Class[1] were represented by Charles
Henry Field, Jr., Kate Mueting, Brent Hannafan, Kevin Sharp, Sharon Kim, and Hampton
Watson of Sanford Hessler Sharp LLP, and by Paul R. Taylor of Byrnes Keller Cromwell

17

18

19

20

21

22

---

[1] Approximately six months before the trial began, the Court certified, pursuant to Federal Rule of Civil
Procedure 23(b)(1), a Class of all participants and beneficiaries of the Milliman, Inc. Profit Sharing and
Retirement Plan who invested, between January 13, 2016, and October 6, 2023 (the "Class Period"), in
any of the following funds: the Unified Trust Wealth Preservation Strategy Target Growth Fund, the
Unified Trust Wealth Preservation Strategy Target Moderate Fund, or the Unified Trust Wealth
Preservation Strategy Target Conservative Fund.  *See* Order at 9–10 (docket no. 106).  Mr. Field and
Ms. Mueting were appointed as Class Counsel, with Mr. Taylor serving as Local Counsel.  *Id.* at 10; *see
also* Minute Order (docket no. 109).  The parties agreed that sending notice about this matter to putative
Class members was unnecessary because, under Rule 23(b)(1), they could not request exclusion.  Joint
Status Report (docket no. 112).

23

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

1  LLP.  Defendant Milliman, Inc. was represented by Michael J. Prame, Edward J.

2  Meehan, and Nehama L. Hanoch of Groom Law Group Chartered, and by Sarah N.

3  Turner and Michael C. Tracy of Gordon Rees Scully Mansukhani LLP.  At the

4  conclusion of the trial, the Court took the matter under advisement.  The Court now

5  enters these Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil

6  Procedure 52(a).

7  **Introduction**

8      Plaintiff Joanna Mattson ("Mattson"), individually and on behalf of the Class,

9  alleges that Defendant Milliman, Inc. ("Milliman") violated the Employee Retirement

10  Income Security Act of 1974 ("ERISA") by including the Unified Trust Wealth

11  Preservation Strategy Target Growth Fund ("WPS Growth Fund"), Unified Trust Wealth

12  Preservation Strategy Target Moderate Fund ("WPS Moderate Fund"), and Unified Trust

13  Wealth Preservation Strategy Target Conservative Fund ("WPS Conservative Fund"),

14  collectively called the "WPS Funds," in the Milliman, Inc. Profit Sharing and Retirement

15  Plan ("Plan").  The WPS Funds are a suite of investment funds that seek to preserve

16  capital and guarantee investors specified levels of risk through the application of a

17  hedging strategy known as the Milliman Managed Risk Strategy ("MMRS"), also known

18  as "the Overlay."

19      Milliman is the named fiduciary for the Plan.  Milliman's Board of Directors

20  ("Board") acts on behalf of Milliman for purposes of carrying out fiduciary obligations to

21  the Plan.  The Board delegated the responsibility for monitoring the Plan's investment

22  options and Plan performance to the Milliman, Inc. Profit Sharing and Retirement Plan

23

Retirement Committee ("Committee").[2]  The Board, through the Committee, has received

advice from an independent investment consultant.  R.V. Kuhns & Associates, Inc.

("RV Kuhns") was the designated consultant at the time the WPS Funds were added to

the Plan in 2012, and it supported the proposal to offer the WPS Funds as additional

options within the Plan, which at that time had fourteen (14) other investment options.[3]

Effective November 1, 2012, the WPS Funds were substituted for existing alternatives in

the Plan known as the Model Portfolios.[4]  Trial Ex. 3 at 1; *see also* Pretrial Order

("PTO") at Admitted Facts 7 & 8 (docket no. 180).  The WPS Funds remain in the Plan

to this day.  The Plan's current independent investment consultant is Cook Street

Consulting, Inc. ("Cook Street"), which began serving in that role in December 2013.[5]

Pursuant to ERISA, Cook Street is considered a fiduciary for the Plan because it "renders

investment advice for a fee or other compensation . . . with respect to any moneys" of the

Plan.  *See* 29 U.S.C. § 1002(21)(A); *see also* PTO at Admitted Fact 12 (docket no. 180).

---

[2] In March 2017, the Milliman Profit Sharing and Retirement Plan Investment Committee merged with the Milliman U.S. Retirement Plan Committee.  Pretrial Ord. at Admitted Fact 5 (docket no. 180).  For purposes of these Findings of Fact and Conclusions of Law, "Committee" refers to both the pre-merger committees and the post-merger consolidated committee.

[3] Four (4) of these fourteen (14) other funds were removed from the Plan in September 2013, *see* Trial Ex. 6 at 2, and as of December 31, 2013, the Plan had ten (10) options besides the WPS Funds, *see* Trial Ex. 9 at 21.

[4] The four (4) Model Portfolios had goals similar to those of the WPS Funds and were a suite of "multi-asset class funds that target risk based on the investor's risk preference."  Trial Ex. 3 at 1.

[5] In 2013, RV Kuhns resigned as the Plan's independent fiduciary consultant.  The Committee thereafter conducted a search for a replacement consultant, receiving proposals from eight entities, and Cook Street was the successful candidate.  Trial Ex. 7; *see* PTO at Admitted Facts 10 & 11 (docket no. 180).  Cook Street is a wholly-owned subsidiary of Morgan Stanley and a nationally-recognized consulting firm that specializes in advising retirement plans on their investments and on plan management.

1      Mattson worked for Milliman from the fall of 2002 until the fall of 2004.  When

2  she first started with Milliman, Mattson rolled roughly $100,000-to-$150,000 from her

3  previous employer's retirement account into the Milliman Plan.  Mattson was initially

4  invested in the Model Portfolios, and when the WPS Funds were added to the Plan, her

5  Model Portfolio funds were automatically transferred to the corresponding WPS Funds,

6  namely the Moderate and Conservative Funds.  *See* Trial Ex. 3.[6]  Mattson's investment

7  philosophy was "set it and forget it."  In 2013, however, she transferred a significant

8  amount of her investments (approximately $155,000) from the WPS Funds into two

9  separate index funds offered in the Plan.  *See* Trial Ex. 304.  After this transfer, Mattson

10 had assets left in only the WPS Moderate Fund.  By December 2016, the amount Mattson

11 maintained in the WPS Moderate Fund was about $63,000.  In November 2017, not quite

12 two years into the almost eight-year long Class Period, *see supra* note 1 (defining the

13 Class Period as January 13, 2016, to October 6, 2023), Mattson withdrew entirely from

14 the Plan and rolled her retirement savings over into a Roth IRA with a separate financial

15 services provider.

16      In this litigation, Mattson asserts that Milliman breached its fiduciary duty of

17 prudence and violated ERISA by retaining the WPS Funds in the Plan.  She further

18 asserts a claim for breach of the duty of loyalty, premised on the contention that Milliman

19 ───────────────────

20 [6] Pursuant to the Investment Mapping Strategy, if a Plan participant who had assets in a Model Portfolio
   did not take action prior to November 1, 2012, the participant's investments would be transferred from the
   Model Portfolio to an equivalent WPS Fund.  Trial Ex. 3.  Specifically, the Conservative and Moderately
21 Conservative Model Portfolios were matched to the WPS Conservative Fund, the Moderately Aggressive
   Model Portfolio was mapped to the WPS Moderate Fund, and the Aggressive Model Portfolio was paired
22 to the WPS Growth Fund.  *Id.*

23

1 retained the WPS Funds in the Plan because it was concerned that removing the WPS

2 Funds would negatively affect Milliman Financial Risk Management, LLC ("FRM"),

3 which is a wholly-owned subsidiary of Milliman and a subadvisor for the WPS Funds.

4 Mattson also contends that Milliman, acting through the Board, failed to adequately

5 monitor the Committee.

6    This case was filed on January 13, 2022, *see* Compl. (docket no. 1), and any

7 claims premised on events prior to January 13, 2016, including the inception of the

8 WPS Funds and their inclusion in the Plan, are barred by ERISA's six-year statute of

9 repose and cannot form the basis of any potential recovery. *See* 29 U.S.C. § 1113(1).

10    For the reasons explained in these Findings of Fact and Conclusions of Law, the

11 Court concludes that Mattson failed to prove her claims by a preponderance of the

12 evidence. As to any alleged breach of the duty of prudence, Mattson failed to establish

13 either the procedural or the substantive prong of such claim; she has not shown that

14 Milliman's processes were unreasonable or that the WPS Funds were imprudent

15 investments. Moreover, the record simply does not support Mattson's contention that the

16 WPS Funds caused the Plan to suffer losses. Mattson also failed to prove her claim for

17 breach of the duty of loyalty because she did not establish that, in connection with the

18 WPS Funds, Milliman acted with anything other than the best interests of Plan

19 participants in mind. Finally, because Mattson has not shown any breach of duty by a

20 delegee of the Board, she cannot prevail on her derivative failure to monitor claim.

21 / / /

22 / / /

23

**Findings of Fact**

**A.     Milliman's Risk-Managed Investment Products**

Milliman is a risk management, benefits, and technology firm that is wholly owned and managed by its principals.  Milliman has offices in major cities around the globe, and it employs a variety of professionals, including "actuaries, technologists, clinicians, economists, climate and data scientists, [and] benefits and compensation experts."  *See* https://www.milliman.com/en/Our-Story.  Milliman's subsidiary, FRM, provides financial advisory services, primarily to insurance companies.  Insurance companies offer fixed and variable annuities to their clients; fixed annuities provide a guaranteed return with a specific interest rate, while variable annuities pay interest that can fluctuate based on an investment portfolio's performance.  When investors purchase variable annuities, they may allocate their funds among different mutual funds, each of which is called a sub-account.  Hedging strategies similar to the one at issue in this case, *i.e.*, the MMRS or Overlay, have been successfully used in connection with such variable annuity sub-accounts.  *See* Tr. (Apr. 4, 2024) at 97:11–24; *see also* Schenck Decl. at ¶ 5 (docket no. 117); Tr. (Apr. 8, 2024) at 6:9–21.[7]

Hedging is one of several ways to protect against a decline in the value of assets invested in the stock market.  Hedging reduces an investment's risk (*i.e.*, protects against

---

[7] The Court and counsel have been provided a draft of the trial transcript ("rough"), which is cited herein as "Tr." for transcript, followed by the date of the proceeding, and then a page and line number, separated by a colon.  Although the "rough" for each trial day begins at page 1, the final or official transcript will be continuously paginated, with no duplication in page numbers.  The Court leaves to the attorneys the task of correlating the "rough" pinpoint citations to the equivalent sections of any official transcript that might be generated.

1   the downside), but at a cost and a potential decrease in returns (*i.e.*, lower upside capture

2   or participation).  The extent to which hedging is appropriate depends on an investor's

3   risk tolerance and expectations.  The riskier an investment, the higher the potential

4   returns need to be for individuals or entities to invest.  Hedging strategies vary depending

5   on the particular risk-managed investment and its manager, but such strategies may

6   involve the use of derivative contracts, commonly called "puts" or "calls," which

7   provide, for a price (known as the "premium"), the right, but not the obligation, to sell or

8   to buy, respectively, an asset for a predetermined amount (called the "strike" or

9   "exercise" price).  *See* 3A Harold S. Bloomenthal, SEC. & FED. CORP. LAW § 2:91 (2d ed.

10   Supp. May 2024).  Although exchanges exist in which puts (and calls) can be traded, for

11   the WPS Funds, FRM uses "synthetic puts" as part of the Overlay because puts (and

12   calls) for the particular mix of assets under management are not available via an

13   exchange.  Tr. (Apr. 8, 2024) at 150:1–24; *see also* Milliman Managed Risk Strategy:

14   THE METHODOLOGY [hereinafter "MMRS White Paper"] at 3–4, Trial Ex. 373

15   (describing the manufacturing of synthetic puts using futures contracts).  FRM creates

16   "synthetic puts" by applying the "no arbitrage principle," which presumes that two assets

17   with identical risks and returns should have the same price, but if they have different

18   prices, a profit can be made by selling the expensive one and buying the cheaper one.  Tr.

19   (Apr. 8, 2024) at 150:25–151:14.

20       Volatility, which is a measure of the variability over time of a security's value, is

21   an approximation of the risk associated with that asset.  To understand the relationship

22   between such risk and the asset's returns, which might provide insight into whether the

23

1   investment is worth its risk, analysts turn to the Sharpe Ratio, named after its creator,

2   Nobel Prize winner William F. Sharpe.  The Sharpe Ratio computes an investment's risk-

3   adjusted return, *i.e.*, its return relative to the risk-free interest rate scaled to the volatility

4   of a given portfolio.  Laffer Report at ¶ 62 (Trial Ex. 206); Valeiras Report at 20 (Trial

5   Ex. 211).  In other words, the Sharpe Ratio indicates how much extra return (or "risk

6   premium") is generated by each unit of risk.  Tr. (Apr. 8, 2024) at 176:11–177:24.  The

7   higher the Sharpe Ratio, the better the investment is considered to be.

8   **B.    Milliman's Retirement Plan**

9          Milliman's and FRM's employees are able to participate in the Milliman, Inc.

10  Profit Sharing and Retirement Plan, which is governed by both Section 401(k) of the

11  Internal Revenue Code ("IRC") and ERISA.  *See* PTO at Admitted Fact 1 (docket

12  no. 180).  Plan participants may select from a menu of different alternatives within the

13  Plan into which contributions may be made in accordance with IRC § 401(k), which

14  permits employees to deposit a portion of their wages to individual accounts that are part

15  of a qualified employer-sponsored profit-sharing plan.  *See* 26 U.S.C. §§ 401(a) & (k).

16  As of December 3, 2021, the Milliman Plan offered eighteen (18) investment options,

17  including "target risk" and "target date" funds,[8] across four (4) categories.  *See* Trial

18  Ex. 184 at App'x 1.  Specifically, the Plan offered (i) nine (9) possibilities in the "Active

19

20  _____

21  [8] A "target risk" fund attempts to remain at its particular risk level (for example, aggressive, moderate, or conservative) for the life of the fund.  In contrast, the risk level for a "target date" fund gradually evolves over time, changing from more aggressive investment strategies to more conservative ones as the fund

22  moves closer to the target date, which usually coincides with the investor's retirement.

23

Tier," (ii) five (5) choices in the "Passive Tier," (iii) the three (3) WPS Funds, which are considered "Target Risk Models," and (iv) the "InvestMap" funds.[9]  *See id.*

### 1.  Qualified Default Investment Alternative

If Plan participants do not select among the various options in the Plan, their assets are invested in the Plan's Qualified Default Investment Alternative ("QDIA").  Under ERISA, a participant who receives the requisite notice is "treated as exercising control over the assets in the account with respect to the amount of contributions and earnings which, in the absence of an investment election by the participant or beneficiary, are invested by the plan in accordance with regulations prescribed by the Secretary [of Labor]."  29 U.S.C. § 1104(c)(5).  To implement this legislation, the Department of Labor has outlined requirements for a QDIA, into which an ERISA plan participant's contributions may be invested if the participant makes no other selection.  *See* 29 C.F.R. § 2550.404c-5.

Prior to 2012, the QDIA for the Plan was the Moderately Aggressive Model Portfolio, one of the funds in which Mattson was invested before it was removed from the Plan.  *See* Trial Ex. 3 at 2.  When the WPS Funds were added to the Plan in 2012, the WPS Moderate Fund replaced the Moderately Aggressive Model Portfolio as the Plan's QDIA, *id.*, and Mattson's Model Portfolio assets were transferred to the WPS Funds.  In October 2016, the moderate "glidepath" within the "InvestMap" funds became the Plan's

___

[9] The "InvestMap" funds are akin to "target date" funds.  They allocate the amounts in a Plan participant's account among the Plan's investment options (other than the WPS Funds) based on the participant's age and personal risk tolerance.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9

QDIA, *see* Trial Ex. 93A at 4; Trial Ex. 76A at 6, and the QDIA-type assets within the

WPS Moderate Fund automatically shifted to the "InvestMap" moderate "glidepath," *see*

Tr. (Apr. 10, 2024) at 49:24–50:4.

### 2. <u>Investment Policy Statement</u>

The Plan is governed in part by a document called an Investment Policy Statement

("IPS").  The Plan's IPS is not an unalterable document, and it has been amended at least

three times since the WPS Funds were added to the Plan.  *See* 2014 IPS (Trial Ex. 14);

2018 IPS (Trial Ex. 132); 2022 IPS (Trial Ex. 184); *see also* Tr. (Apr. 1, 2024) at 116:4–8

(indicating that the IPS is reviewed at least annually and amended every three-to-five

years or as needed).  The 2014 IPS, 2018 IPS, and 2022 IPS each recite an intent to

comply with ERISA, as well as the Internal Revenue Code, and "to assist the relevant

parties in effectively supervising, monitoring and evaluating the Investment Alternatives

available to Participants."[10]  *See* Trial Exs. 14, 132, & 184.

Since 2014, each iteration of the Plan's IPS has enumerated criteria[11] that the

Committee should consider when recommending "Investment Alternatives" (defined as

---

[10] The record does not reflect the content of any Investment Policy Statement predating the one adopted on May 7, 2014.  Although the 2014 IPS, 2018 IPS, and 2022 IPS were adopted after the addition of the WPS Funds to the Plan, and thus, at that time, could not have provided guidance to the "relevant parties," including the Committee and the Board, the Court has considered the documents because they outline how the various fiduciaries should monitor investment options in the Plan and how those fiduciaries should interact with each other.

[11] Over time, the factors have remained fairly constant, guiding the Committee to review the Investment Alternative's assets under management, correlation with its asset class and/or peer group, performance relative to a peer group or benchmark, performance relative to risk, expense ratios and fees, stability, and administrative constraints.  *See* Trial Exs. 14, 132, & 184 at Part VI.  More recently, regulatory oversight and tracking error have been added as metrics of concern.  Trial Ex. 184 at Part VI(1)(a) & (g).

"investment options offered in the Plan") to the Board.  In addition, the versions of the

Plan IPS that were in effect during the Class Period required the Committee to evaluate

each Investment Alternative on "at least an annual basis."  Trial Exs. 14, 132, & 184 at

Part VII.  The monitoring procedures set forth in the Plan IPS include a provision for

placing an Investment Alternative on a "watchlist."  *Id.*  The 2014 IPS and 2018 IPS

contained specific "watchlist" parameters, primarily relating to underperformance,

management or other changes, and fee increases, but the 2022 IPS simply cross-

references the selection criteria for Investment Alternatives.  *Id.*  "Watchlist" status

subjects an Investment Alternative to a greater level of monitoring, and is generally

considered to be the first step towards removing a fund from the Plan.  Throughout the

past several years, however, the Plan's IPS has consistently acknowledged that

> [t]he decision to retain or terminate an Investment Alternative cannot be made by a formula.  It is the Committee's confidence in the Investment Alternative's ability to perform in the future that ultimately determines the recommendation to retain the Investment Alternative.  No one factor will be conclusive, but a review of all of these factors together will form the basis for any Committee recommendation.

Trial Exs. 14 & 132 at Part VII(2); *accord* Trial Ex. 184 at Part VII(4).  In addition, the

current IPS, adopted on February 8, 2022, makes clear that, although the Committee

intends to comply with the IPS, "it may, in its discretion, whether through formal action

or inaction, deviate from this Statement at any time for any or no reason," and that the

IPS "is not binding," but the exercise of creating and maintaining it "helps ensure that the

Committee's process is prudent."  Trial Ex. 184 at Part I(3) & (4).

**C.**     **The Plan's Governance Structure**

Milliman is the Plan's settlor, sponsor, and named fiduciary.  PTO at Admitted Facts 2–3 (docket no. 180).  The Board acts on behalf of Milliman, as the named fiduciary, for purposes of the Plan.  *Id.* at 4.  The Board has the ultimate authority for selecting the Investment Alternatives in the Plan.  2014 IPS at 1 (Trial Ex. 14); 2018 IPS at 1 (Trial Ex. 132); 2022 IPS at Part I(2) (Trial Ex. 184).  The Board has delegated to the Committee the responsibility to "oversee the Investment Alternatives and make recommendations to the . . . Board . . . on matters relating to the investment of Plan assets."  *See* Trial Exs. 14, 132, & 184 at Part I.  The Board appoints the members of the Committee, who are employees of either Milliman or FRM.  PTO at Admitted Fact 6 (docket no. 180).

The Committee meets quarterly, generally in February, May, August, and November, and its meetings are attended by Committee members, advisors from Cook Street, non-voting advisory participants, and other personnel.  The Committee abides by the standard formalities, taking attendance at and generating written minutes of its meetings, which are later approved via a vote.  *See* Trial Exs. 7, 12, 16A, 19, 23, 30A, 40A, 48, 57A, 66A, 76A, 83A, 93A, 99A, 105A, 110A, 113A, 117A, 123, 131A, 140, 144A, 151A, 158A, 162A, 165A, 167A, 176B, 183A, 190A & 190B, 359, 364, 370, 381, 384, 390, 393, & 400.  During its meetings, the Committee usually hears from Cook Street about the market and the performance of the Plan's Investment Alternatives, and then discusses the matters on its agenda.

1      As part of its November 2015 meeting, Committee members also received training

2   on their fiduciary duties, including their duties of prudence and loyalty, and the subject of

3   "Fiduciary Update" or "Fiduciary Training" appears in the minutes of subsequent

4   meetings.  *See* Trial Exs. 57A & 58; *see also* Trial Ex. 66A, 83A, 99A, 110A, 113A,

5   117A, 123, 131A, 140, 144A, 165A, 176B, 190A & 190B, 359, & 364.

6      The Committee submits annual reports on its activities to the Board.  These reports

7   have generally been brief and focused on action items for the Board.  *See* Trial Exs. 6, 17,

8   43, 50, 107, 122, 141, 157, 173, & 351.  Notably, these annual reports are typically

9   circulated to all Milliman principals, approximately 400 individuals in total, for comment

10  and feedback in advance of the Board's official meeting.  Tr. (Apr. 1, 2024) at 124:19–

11  126:13.  The Committee also submits to the Board, when appropriate, written

12  recommendations; over the past ten years, approximately four or five such written

13  recommendations were forwarded by the Committee to the Board, including a

14  recommendation to terminate a fund managed by Eaton Vance Corp.  Tr. (Apr. 8, 2024)

15  at 93:15–94:6.  In addition, from 2012 to 2022, a decade-long period that overlaps with

16  most of the Class Period, Milliman's former Chief Executive Officer ("CEO") Stephen

17  (aka Steve) White was both a Board member and a Committee member, and he was able

18  to facilitate informal communications between the Committee and the Board.  *See* Tr.

19  (Apr. 1, 2024) at 121:2–22.

20  / / /

21  / / /

22  / / /

23

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 13

1   **D.**      **The WPS Funds**

2         **1.**      **Addition of the WPS Funds to the Plan**

3               In recommending, in 2012, that the Model Portfolios be replaced with the WPS

4   Funds, the Committee explained that:

5         • [The WPS Funds] contain the same target risk features of the current
            model portfolios but augment that with additional innovative hedging
6           techniques to manage risk;

7         • They provide investors with access to the same risk management
            processes used to protect the balance sheets of major financial
8           institutions;

9         • They address the "sequence of returns problem" whereby large market
            declines coupled with participant withdrawals accelerate the depletion of
            a retirement account;

10        • They reduce the likelihood of value-destroying transactions driven by
            participant fear after large market drops;

11        • They improve are [sic] diversity of our fund offerings by offering hedging
12          techniques on a traditional target risk fund platform; and

13        • Our outside consultant, RV Kuhns considers this to be a reasonable
            approach.

14  Trial Ex. 303 at 19019–20.  Although Mattson and her experts criticize the addition of the

15  WPS Funds as imprudent, Mattson's claims in this litigation cannot be, and are not, based

16  on Milliman's decision to substitute the WPS Funds for the Model Portfolios.  As

17  previously indicated, Mattson is time-barred from challenging the "inception" of the

18  WPS Funds, *see* 29 U.S.C. § 1113(1), and she has made no showing that the Model

19  Portfolios would have fared better than the WPS Funds.  Thus, to the extent that Mattson

20  alleges a lack of prudence relating to (i) the addition of the WPS Funds to the Plan,

21  (ii) the lack of actual performance history or a track record for the then-new WPS Funds,

22

23

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 14

1    or (iii) any inaccuracy in the hypothetical performance data that was provided to Plan

2    participants, such claim is precluded as untimely.

3           Mattson is similarly precluded from asserting any breach of loyalty premised on

4    FRM's selection as a subadvisor to the WPS Funds.  The decision to engage FRM as a

5    subadvisor was made more than six years before Mattson initiated this action, and she

6    makes no assertion that any fraud, concealment, or lack of knowledge would have tolled

7    the period of repose.  *See id.*  Indeed, from the outset, the Committee recognized that

8    FRM's role created the appearance of a potential conflict of interest.  *See* Trial Ex. 303

9    at 19019.  Sam Nandi, who was both a co-leader of FRM and a member of the

10   Committee when the WPS Funds were under consideration, recused himself from the

11   Committee's vote on whether to recommend adding the WPS Funds to the Plan.  Tr.

12   (Apr. 4, 2024) at 93:21–94:10.  To cure any potential conflict of interest, the Committee

13   directed that language disclosing Milliman's relationship with FRM be prepared and

14   included in a handout distributed to Plan participants.  Trial Ex. 303.  As a result, the

15   announcement about the addition of the WPS Funds that was distributed to Plan

16   participants read, in part, as follows:

17           Please note that Financial Risk Management, LLC, a wholly-owned
             subsidiary of Milliman, Inc., acts as a sub-adviser for the . . . [WPS] Funds.
18           Milliman has sought to manage the appearance of any conflict of interest
             with respect to adopting these funds for which Milliman FRM serves as a
19           subadvisor.  Specifically, we have undertaken the following step:

20           Both Milliman's FRM practice and Huntington Funds have agreed to waive
             their respective fees for the Plan assets that are invested in these funds.
21           Therefore, the net annual fees charged to Plan assets invested in each . . .
             [WPS] Fund after those waivers will be 32 basis points (i.e., 0.32%).
22           Furthermore, the fees will decline to 27 basis points (0.27%) after 18 months

23

and 23 basis points (0.23%) after 3 years and will remain at 23 basis points (0.23%).

Trial Ex. 3; *see also* Trial Ex. 303.  Given these disclosures and fee waivers, Mattson cannot assert any basis for relief from the six-year time limit for bringing her claim for breach of the duty of loyalty, and the merits of such claim will be evaluated only with respect to events occurring on or after January 13, 2016.

### 2.    Objectives and Strategies of the WPS Funds

The WPS Funds are managed by two entities, namely (i) Unified Trust Company ("Unified"), which is the WPS Funds' trustee and investment manager,[12] and (ii) FRM, the contracted subadvisor to Unified for the WPS Funds.  *See* Trial Ex. 5; PTO at Admitted Facts 14–15 (docket no. 180).  Unified is responsible for the asset allocations of the WPS Funds, which include a mixture of exchange-traded funds ("ETFs") in various segments of the equity markets, money market or mutual funds, fixed income products such as bonds, and cash.  FRM manages the Overlay for the WPS Funds, determining when and by how much to hedge the WPS Funds' equity exposures.

When the WPS Funds were created, each fund had different allocations among asset classes.  *See* Trial Ex. 4 at 1–6.  The identified asset classes were (i) fixed income, (ii) large cap, mid cap, small cap, and international ETFs and mutual funds, which are

---

[12] At the inception of the WPS Funds in November 2012, Huntington National Bank ("Huntington") was the trustee for the funds, with "ultimate fiduciary authority over the management of, and investments made, in the Fund[s]."  Trial Ex. 4 at 1–6 (Fact Sheets dated as of June 30, 2012).  In July 2013, Unified succeeded Huntington National Bank as the WPS Funds' investment manager.  PTO at Admitted Fact 14 (docket no. 180).

collectively considered "gross equity," and (iii) cash.  *Id.*  The asset class diversification

data provided on the initial Fact Sheets about the WPS Funds excluded "positions in

exchange traded futures contracts."  *See id.* at 1, 3, & 5.  In other words, the figures in the

initial Fact Sheets, which are summarized in the following table, did not reflect for the

WPS Funds any anticipated "net equity," *i.e.*, the equity exposure after considering the

hedging effects of the Overlay.

| Asset Class Diversifications for WPS Funds (as of June 30, 2012) | | | |
|---|---|---|---|
| **Asset Class** | **Growth** | **Moderate** | **Conservative** |
| Fixed Income | 7% | 22% | 42% |
| Gross Equity | 85% | 70% | 50% |
| Cash | 8% | 8% | 8% |

*See* Fact Sheets at 1, 3, & 5 (Trial Ex. 4).

In addition to different gross equity percentages, each WPS Fund has a particular

target risk level, with asset allocations and the Overlay being the mechanisms by which

volatility is managed.  The investment objective for each WPS Fund is "[c]apital growth

and income consistent with the Fund's current asset allocation and volatility target."  *See*

Fact Sheets (Trial Ex. 4).  The volatility targets vary by fund as follows:

| **Fund** | **Volatility Target** |
|---|---|
| WPS – Growth Fund | 12% |
| WPS – Moderate Fund | 10% |
| WPS – Conservative Fund | 8% |

*See* Unified WPS IPS at 2, (Trial Ex. 5 at 12); *see also* Fact Sheets (Trial Ex. 4).  The

Overlay stabilizes volatility around the target levels by going beyond the traditional static

1  allocation among different types of assets (for example, 60% stocks and 40% bonds) and

2  "synthetically adjusting portfolio weights" by using exchange-traded future contracts.

3  *See* MMRS White Paper at 2 (Trial Ex. 373).  As indicated earlier, the Overlay also

4  employs "synthetic puts," which offer "capital protection" for the WPS Funds.  *See id.* at

5  2–4.

6        The effect of the Overlay's volatility management and capital protection

7  components can be seen in the following charts, the first three of which show volatility

8  over time for each of the WPS Funds (in red), as compared with certain Morningstar[13]

9  indices, and the last of which indicates the average net equities per quarter for each of the

10 WPS Funds from the first quarter of 2014 through the last quarter of 2022.

11

12

13 

14

15

16

17

18

19

20 Ex. 2 to Conrad Report (Trial Ex. 431).

21 _____

22 [13] Morningstar, Inc. is a widely recognized and respected financial reporting group.  Both Mattson and
   Milliman have relied on information from Morningstar throughout this case.

23



Ex. 3 to Conrad Report (Trial Ex. 431).



Ex. 6 to Conrad Report (Trial Ex. 431).



In the above chart, the colored bands show the range of equity allocations for certain Morningstar Peer Groups:  70-85% is in blue, 50-70% is in orange, and 30-50% is in green.  The solid lines, blue for the WPS Growth Fund, orange for the WPS Moderate Fund, and green for the WPS Conservative Fund, show the average net equities per quarter for the period illustrated.  The dotted lines (with the same color-coding) show the overall average over the timeframe for each WPS Fund.  The chart was generated using the data in Trial Ex. 262A, which was calculated from the "Net Equity" tab of the Unified Historical Hedge Summary (Trial Ex. 198).

As reflected in the foregoing graphs, volatility levels and average net equities for each WPS Fund fluctuated during the periods analyzed, but volatilities remained close to their target values, and net equities for the WPS Funds were within the ranges of their Morningstar Peer Groups, which became benchmarks for the funds in 2018.  The comparisons are shown in the table on the next page.

| | VOLATILITY | | EQUITY ALLOCATION | |
|---|---|---|---|---|
| | **Target** | **Average** (1/13/16–7/6/23) | **Morningstar Peer Group** | **Average Net Equities** (1/1/16–6/30/23) |
| WPS Growth Fund | 12% | 10.1% | 70–85% | 76.7% |
| WPS Moderate Fund | 10% | 9.2% | 50–70% | 67.2% |
| WPS Conservative Fund | 8% | 7.4% | 30–50% | 50.1% |

*See* Trial Ex. 431; Table 4 to Conrad Rebuttal Report (Trial Ex. 432).

Mattson's claim that Milliman acted imprudently in keeping the WPS Funds in the Plan is premised on a theory that the Overlay caused them to underperform. Contrary to Mattson's argument, however, Milliman could not have simply continued to offer the WPS Funds in the Plan without the Overlay. As Unified's representative David Roberts testified at trial, because the Overlay is "integral" to the WPS Funds' ability to achieve their stated investment goals of managing volatility and preserving capital, Unified would have ceased offering the WPS Funds on the market if the Overlay was removed. *See* Tr. (Apr. 5, 2024) at 92:23–93:7.

### 3. Monitoring the WPS Funds

#### a. Benchmarks

As part of its monitoring process, Cook Street evaluates the performance of the WPS Funds, as well as all the other Investment Alternatives in the Plan, against certain benchmarks, *i.e.*, peer groups or relevant market indices. *See* 2014 IPS & 2018 IPS (Trial Exs. 14 & 132 at Part VII(1)); *see also* App'x 1 to 2022 IPS (Trial Ex. 184). The 2014

1 IPS identified the Unified Custom Indices[14] as the benchmarks for the WPS Funds. *See*

2 App'x A to 2014 IPS (Trial Ex. 14). In contrast, both the 2018 IPS and the 2022 IPS

3 specified Morningstar indices with comparable equity allocations ("Morningstar Peer

4 Groups") as the benchmarks for the WPS Funds. *See* App'x A to 2018 IPS (Trial

5 Ex. 132); App'x 1 to 2022 IPS (Trial Ex. 184).

6 　　　　Consistent with the 2014 IPS, which was adopted by the Committee in May 2014

7 and approved by Cook Street and Milliman in October 2014, *see* Trial Ex. 14 at 7, Cook

8 Street's quarterly reports for the last quarter of 2014 and the first three quarters of 2015

9 compared the performances of the WPS Funds against the performances of their

10 respective Unified Custom Indices.[15] *See* Trial Exs. 24, 37, 46, & 54. During the

11 second quarter of 2015 ("Q2 2015"), however, Cook Street generated a separate report

12 concerning the WPS Funds. *See* Trial Ex. 47. In this report, which was distributed to the

13 Committee, Cook Street offered data concerning the Hypothetical Unprotected Portfolio

14

15 ────────────────────

16 [14] The Unified Custom Indices are blends of six other market indices, weighted as follows:

| Index | Conservative | Moderate | Growth |
|---|---|---|---|
| BofAML US Treasury Bill 3 Mo | 8% | 8% | 8% |
| Barclays Capital US Aggregate | 42% | 22% | 7% |
| S&P 500 | 20% | 28% | 34% |
| S&P MidCap 400 | 7.5% | 10.5% | 12.5% |
| Russell 2000 | 7.5% | 10.5% | 12.5% |
| FTSE Global All Cap ex US | 15% | 21% | 26% |

20 *See, e.g.*, Cook Street Report 2014 Q4 at 35 nn.18–20 (Trial Ex. 24).

21 [15] Cook Street's quarterly report for the last quarter of 2013, which was the quarter during which Cook Street became the independent investment consultant for the Plan, *see* Trial Ex. 8 (dated Dec. 20, 2013), and its quarterly reports for the first three quarters of 2014 also compare the performances of the WPS Funds against the performances of the custom indices. *See* Trial Exs. 9, 13, 15, & 22.

23

("HUP") for each WPS Fund, as well as the comparable Unified Custom Indices, Morningstar Target Risk Indices,[16] and Morningstar Peer Groups. *Id.* at 5. Cook Street provided the Committee with a similar separate report relating to the WPS Funds for the third quarter of 2015 ("Q3 2015"), *see* Trial Ex. 55, as well as a lengthier document containing its "Supplemental Analyses," *see* Trial Ex. 56.

The HUP represents the assortment of assets in its respective WPS Fund, and the HUP's performance reflects the returns from the exact mix of investments without any hedging. For example, the Conservative HUP provides insight into how the performance of the WPS Conservative Fund is affected by the Overlay. The same is true for the Moderate HUP and WPS Moderate Fund, as well as for the Growth HUP and WPS Growth Fund. Importantly, however, the HUPs are not available investment vehicles, and they have never been designated as benchmarks for the WPS Funds.

Although Cook Street has included, in its various specific reports and handouts about the WPS Funds, information about the Unified Custom Indices and Morningstar Target Risk Indices, it considers the Morningstar Peer Groups to be more appropriate benchmarks for the WPS Funds. *See* Trial Ex. 76A at 3. The Morningstar Peer Groups include competitor funds with equity allocations similar to those of the WPS Funds and, unlike the Unified Custom Indices (and the HUP), the competitor funds in the

---

[16] The Morningstar Target Risk Indices consist of five indices with different equity risk preferences, namely aggressive, moderately aggressive, moderate, moderately conservative, and conservative. Each index reflects a mixture of assets (equity, bonds, inflation hedge, and cash), with the percentages varying by risk preference.

Morningstar Peer Groups are available in the marketplace for investment.  The 2018 IPS and 2022 IPS have memorialized Cook Street's view, specifying the Morningstar Peer Groups as the benchmarks for the WPS Funds.[17]  *See* Trial Exs. 132 & 184.

### b.    Events Leading to Cook Street's Creation of Separate Reports for Q2 and Q3 2015

The WPS Funds performed adequately for the first several quarters they were in the Plan.  Indeed, in response to the Court's and Milliman's counsel's questions at trial,

---

[17] Mattson argues that the Morningstar Peer Groups are inapt comparators because they have lower equity allocations than the WPS Funds.  This contention is unpersuasive.  As reflected in the earlier graph showing average net equities per quarter, *see supra* p. 18, and as explained at trial by Stuart Thomas, a co-founder of Cook Street, the Morningstar Peer Group assigned to each WPS Fund contains assets with equity allocations in the range in which the WPS Fund's equity allocation fluctuates over time as a result of the Overlay.  Tr. (Apr. 3, 2024) at 112:9–24.  Moreover, from January 2014 to December 2022, the WPS Funds' average quarterly equity allocations were squarely within the equity allocation ranges of their peer groups.  During his closing remarks, Mattson's attorney questioned how Cook Street could have chosen the Morningstar Peer Groups as benchmarks, accusing Cook Street of lacking "knowledge and understanding of what was in these peer groups," Tr. (Apr. 10, 2025) at 25:24–26:1, and citing *Anderson v. Intel Corp. Investment Policy Committee*, 579 F. Supp. 3d 1133 (N.D. Cal. 2022).  This argument misstates Thomas's testimony, misrepresents the record, and misapplies the analysis set forth in *Anderson*.  During examination by Mattson's counsel, Thomas indicated that Cook Street "had an understanding of how the peer groups were constituted," and that, to provide the requisite commentary within its reports, Cook Street "had to have looked at what those peer groups looked like from an asset allocation perspective."  Tr. (Apr. 3, 2024) at 121:24–25 & 123:3–7.  Although Thomas was unable to recall at trial exactly how many funds within each Morningstar Peer Group were passively managed or the number of volatility managed funds in each peer group, *id.* at 125:4–20, such lack of memory about these types of details, which likely changed over time, does not raise any doubt about Cook Street's "knowledge and understanding" when it prepared its reports.  As indicated by Thomas, Cook Street has a license or agreement with Morningstar pursuant to which it has access to the methodology by which the Morningstar Peer Groups are constituted.  *Id.* at 108:22–109:6.  Moreover, in providing Morningstar Peer Group data prior to adoption of the 2018 IPS, Cook Street did not disregard the benchmarks designated in the 2014 IPS, and even after the Morningstar Peer Groups became official benchmarks, Cook Street still offered information about the Unified Custom Indices, as well as the HUPs.  *See, e.g.*, Trial Ex. 195A at 43–50.  Finally, unlike in this matter, in which the Morningstar Peer Groups were (and still are) actually used by the Plan fiduciaries in evaluating the performance of the WPS Funds, in *Anderson*, the basis for the court's refusal to consider a Morningstar "peer group category" as a meaningful benchmark was the plaintiffs' failure to adequately plead the necessary facts, *i.e.*, the "similar aims, risks, and rewards" as the assets the plaintiffs claimed were imprudently managed.  579 F. Supp. 3d at 1149–52.  *Anderson* is both factually and procedurally distinguishable, and the Court rejects Mattson's challenge to the Morningstar Peer Groups as meaningful measures of performance for the WPS Funds.

1    Mattson's expert Arthur Laffer, Ph.D., conceded that a fiduciary would have been

2    reasonably prudent to retain the WPS Funds in the Plan based on their performance

3    through the third quarter of 2014 ("Q3 2014").  Tr. (Apr. 2, 2024) at 62:2–63:4, 103:25–

4    105:1.  Almost immediately after the returns of the WPS Funds became concerning,

5    which Mattson's expert testified was not until the fourth quarter of 2014 ("Q4 2014"),

6    Milliman began to take action.  In January 2015, after receiving Q4 2014 data,

7    Milliman's CEO (White) and Committee chairperson Mike Schmitz discussed the

8    underperformance of the WPS Funds.  *See* Tr. (Apr. 1, 2024) at 133:1–134:22.  On

9    January 27, 2015, Schmitz reached out to Cook Street regarding the WPS Funds' Q4

10   2014 returns.  *See* Trial Ex. 311.

11                    **i.    "V-Shaped" Markets**

12          In response to Schmitz's email, Cook Street indicated that the next quarterly

13   review would include additional information on the WPS Funds.  *Id.*  Cook Street also

14   explained that "the performance of the portfolios has lagged the benchmark in excess of

15   the expected costs of hedging" because "hedges are designed to limit the expected

16   volatility of each portfolio and preserve capital during ***sustained*** market declines," as

17   opposed to "periods in which volatility expansions are ***brief*** in nature and ***quickly*** subside

18   to coincide with sharp market reversals to the upside," also known as "v-shaped" markets

19   or recoveries.  *Id.* (emphasis added).

20          A similar discussion, about how and why, in Q4 2014, the "hedging programs

21   reduced effective equity exposure" for the WPS Funds to their lowest levels of the year,

22   accompanied Cook Street's quarterly review, which was presented to the Committee and

23

discussed at its meeting on February 3, 2015.  Trial Ex. 24 at 42; *see* Trial Ex. 30A.  In

conjunction with this meeting, Cook Street shared with Committee members a handout,

which is reproduced on the next page.  As indicated in the handout, although the MMRS

or Overlay operated expeditiously to reduce the amount of equity exposure and protect

against loss during the two market downturns in Q4 2014, regaining equity positions after

the market quickly rebounded required some time, perhaps several days.  The WPS

Growth Fund was more impacted by this lag than the other two WPS Funds because its

equity allocation is higher.



Trial Ex. 29 at 2.

1    In addition to the handout, Cook Street also circulated to the Committee a

2  memorandum regarding "MMRS Summary Q4 2014," which had been prepared by the

3  Milliman Portfolio Management Team.  Trial Ex. 29.  The memorandum further

4  commented about the "drag" caused by "v-shaped" markets and identified the reasons for

5  the two market meltdowns in Q4 2014, including fears about Ebola, and for the

6  "dramatic" market recoveries.  *Id.* at 3–4.  Cook Street reported that the maximum level

7  of hedging for the quarter occurred on October 16, 2014, when the equity exposures for

8  the WPS Growth, Moderate, and Conservative Funds were 60.8%, 57.7%, and 49.1%,

9  respectively.  Trial Ex. 24 at 42.  When the market experienced a "sharp subsequent

10  rally," the WPS Funds experienced a lag in removing the hedging positions, but they

11  finished the quarter with equity positions of 89.6%, 74.0%, and 53.4%, respectively,

12  which was consistent with their general goals.  *See id.*  Thus, Cook Street indicated that it

13  "remain[ed] pleased with the in-depth methodology and strict risk and compliance

14  controls in place on the portfolios."  *Id.*  Having received all of this information, the

15  Committee perceived that the Overlay was "performing in line with how we would

16  expect it to perform," but requested that a longer educational and review session about

17  the MMRS be provided at the next quarterly meeting.  *See* Trial Ex. 30A.

18    At the following meeting on May 5, 2015, the Committee spent a substantial

19  amount of time discussing the WPS Funds.  *See* Trial Ex. 40A.  According to the

20  minutes, the Committee reviewed the ratio of Milliman to non-Milliman assets in the

21

22

23

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 27

1  WPS Funds, which had improved during the first quarter of 2015 ("Q1 2015").[18]  *Id.*  The

2  Committee also heard about Cook Street's due diligence efforts, including meeting with

3  Unified and FRM, and about how to evaluate whether the hedging strategy is successful.

4  *Id.*  The Committee learned that, for the Overlay, success "is not determined in the

5  traditional manner, i.e. [strictly] performance," but rather by also considering that the

6  WPS Funds "are intended to achieve 75% of the upside but experience only 25–30% of a

7  sustained downside."  *Id.*  Based on its scrutiny of the WPS Funds, Cook Street

8  recommended in its Q1 2015 Report and at the May 2015 Committee meeting that the

9  WPS Funds remain in the Plan.  *See* Trial Ex. 37 at 36; Trial Ex. 40A at 4.

10                          **ii.   <u>Separate Reports</u>**

11         Cook Street, however, intensified its monitoring of the WPS Funds and, in

12  preparation for the Committee's next meeting on August 4, 2015, it generated and

13  circulated to the Committee the separate report mentioned earlier.  In this report for

---

17  [18] The extent to which other (non-Milliman) investors have assets in the WPS Funds is a measure of their
attractiveness as investments.  Between Q4 2014 and Q1 2015, the percentages of Milliman (and non-
Milliman) assets in the WPS Funds changed as follows:

|                        | Percentage of Milliman Assets | |
|------------------------|:-------:|:-------:|
|                        | **Q4 2014** | **Q1 2015** |
| WPS Conservative Fund  | 81.6%   | 79.1%   |
| WPS Moderate Fund      | 82.5%   | 78.7%   |
| WPS Growth Fund        | 61.9%   | 43.5%   |
| **Total**              | 73.4%   | 60.6%   |

Trial Ex. 24 at 42; Trial Ex. 37 at 36.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 28

Q2 2015, titled "Wealth Preservation Funds Review," Cook Street provided the following executive summary:

1.    During the quarter, the funds continued to experience growth in non-Milliman investor assets as Unified broadened implementation across their recordkeeping and custodial platform.

. . . .

2.    Relative performance for the funds is driven by three fundamental factors: Unified's delineation of asset allocation targets for the funds, Unified's usage of underlying passively-managed exchange-traded funds (ETFs), and Milliman FRM's execution of its volatility management and capital protection strategies.

   a.    The target risk portfolios generally performed in-line with their hypothetical unhedged portfolios during the [2nd] quarter [of] 2015.

   b.    The portfolios slightly underperformed Unified's custom benchmark indices. Returns were negatively impacted by the portfolios' longer duration positioning (particularly for the Conservative portfolio), underperformance from the portfolios' small-cap U.S. stock holdings, and as a result of an initial hedge position in the Growth portfolio.

   c.    Returns relative to Morningstar benchmark indices and peer groups were mixed during the quarter. The portfolios benefitted from higher equity weightings relative to peers (as equities outperformed fixed income). However, the portfolios' longer duration positioning and underweight exposure to mortgage securities detracted from returns as interest rates rose. The portfolios' underweight exposure to international stocks also detracted from relative performance as international markets outperformed U.S. markets.

Trial Ex. 47 at 2. Notably, the separate report for Q2 2015 does not attribute any underperformance of the WPS Funds with respect to their benchmarks (*i.e.*, the Unified Custom Indices) to "lags" or "drags" caused by "v-shaped" markets, and the volatility for the quarter is described as "benign." *Id.* at 6 & 8. The Committee summed up Cook

Street's review as indicating that "everything was pretty quiet during the quarter," Trial Ex. 48 at 3, and it accepted Cook Street's recommendation that the WPS Funds "Remain in Plan," Trial Ex. 46 at 35, but it anticipated that FRM would attend the next Committee meeting and discuss the Overlay, Trial Ex. 48 at 4.

In its annual report to the Board dated August 13, 2015, the Committee stated as follows:

> The Committee has been more closely monitoring the Wealth Preservation Target Risk funds which began as a result of the change in ownership from Huntington to Unified Trust in late 2013. . . .
>
> Our primary concern in 2013 was the viability of the funds if Milliman continues to represent a substantial portion of the invested assets, or if the funds remain small.  However, there has been substantial growth in non-Milliman funds, and we will continue to monitor that situation with Cook's assistance.  Additionally, we have been monitoring the performance of the Wealth Preservation funds in light of underperformance of the Growth and Moderate funds relative to benchmarks beginning in fourth quarter 2014. The underperformance has been attributed to the high degree of volatility in recent quarters where markets have dropped but rebounded quickly afterward.    Such  V-shaped  recoveries  have  contributed  to  the underperformance of the funds as the hedges against sustained market downturns have caused the Growth and Moderate fund[s] in particular to under-participate in the rapid recovery after the downturns.  In response to these performance concerns, we have asked Cook [Street] to work closely with Unified and Milliman FRM to investigate performance in light of recent market conditions.  Cook [Street] conducted onsite meetings with Unified and FRM and believes that they are still appropriate selections for our Plan and that the Moderate fund is still an appropriate QDIA, but they will continue to scrutinize the funds and report to the Committee.

Trial Ex. 50 at 2.  The Committee's annual report was introduced at the Board's meeting on September 3, 2015, by Milliman CEO and Committee member Steve White.  Trial Ex. 53 at ¶ 9.  Informal notes of that meeting reflect that the Board understood that the

1   Committee, "with input from the investment consultant, will continue to review the

2   performance of the Wealth Preservation Funds." *Id.*

3       As planned, at the next Committee meeting on November 3, 2015, FRM made a

4   presentation concerning the MMRS.  Trial Ex. 57A at 4–6.  In explaining the "drag"

5   related to "V-shaped" markets, FRM indicated that completely removing a hedging

6   strategy requires about one-to-two weeks, during which a portion of the market recovery

7   will be missed.  *Id.* at 5.  FRM also reported that, at that time, it had $70 billion in assets

8   under management, including "a $10 billion family of funds that implemented MMRS"

9   on July 31, 2015.  *Id.* at 5–6.  FRM represented that its clients did not appear to be

10  concerned about MMRS's performance, which was not quite keeping up with the market,

11  and they were not moving from MMRS to other hedging strategies.  *Id.* at 6.  According

12  to FRM, if its clients leave, they do so "because they are opting out of any hedging

13  strategy."  *Id.*  Consistent with FRM's account about its satisfied clientele, Cook Street

14  reported, in its "Supplemental Analyses" accompanying its separate report, that the WPS

15  Funds experienced an increase in both non-Milliman investor assets and total assets

16  "despite the difficult market environment experienced during the third quarter" of 2015.

17  Trial Ex. 56 at 8.  Having posed specific questions and heard FRM's responses, and

18  having the benefit of Cook Street's separate report, Trial Ex. 55, and "Supplemental

19  Analyses" for Q3 2015, Trial Ex. 56, as well as Cook Street's update during the course of

20  the November 2015 meeting, *see* Trial Ex. 57A, the Committee was well-positioned (i) to

21  understand and accept Cook Street's recommendation that the WPS Funds "Remain in

22  Plan,"  Trial Ex. 54 at 40, and (ii) to continue with its own monitoring efforts.

23

1              c.    **Events Leading to "Watchlist" Status in 2016**

2          During the fourth quarter of 2015 ("Q4 2015"), the WPS Funds underperformed

3   their benchmarks (as well as their respective HUPs) because they were in significantly

4   hedged positions entering the quarter and were not able to fully benefit from a market

5   rebound that occurred in October 2015.  *See* Trial Ex. 66A at 3; Trial Ex. 63 at 3.  At its

6   meeting on February 2, 2016,[19] during which it reviewed the Q4 2015 returns, the

7   Committee discussed whether the WPS Funds should be placed on the "watchlist."  Trial

8   Ex. 66A at 3.  Nevertheless, having been advised that, in January 2016, "the Moderate

9   and Growth funds outperformed the hypothetical unhedged portfolios," that "the

10  Milliman Managed Risk Strategy appears to be working as expected within the Wealth

11  Preservation Funds," and that Cook Street "is evaluating the Wealth Preservation Funds

12  with the same level of detail as if they are on the Watch List," *id.*, the Committee opted

13  not to take, at that time, the initial step toward removing the WPS Funds from the Plan.

14         By the next Committee meeting on May 3, 2016, however, Cook Street had placed

15  the WPS Funds on the "watchlist."  Trial Ex. 74 at 3.  At its May 2016 meeting, the

16  Committee and Cook Street "discussed at length" the ramifications of the WPS Funds

17  being on the "watchlist."  Trial Ex. 76A at 3.  Cook Street did not recommend an

18  immediate removal of the WPS Funds from the Plan, but it did recommend re-evaluating

19  the designation of the WPS Moderate Fund as the QDIA for the Plan.  *Id.* at 1.  The

20  Committee was already considering a redesignation of the QDIA in connection with the

21  ————————————————

22  [19] The February 2016 Committee meeting was the first one after the beginning of the Class Period.

23

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 32

1    anticipated addition to the Plan of the Investment Alternative known as "InvestMap."

2    During the same meeting, the Committee expressed disagreement with Cook Street about

3    whether the conservative or moderate "glidepath" in "InvestMap" would be "the better

4    option" for the QDIA, with the Committee favoring the latter because participants who

5    default into the QDIA tend to be younger and the moderate "glidepath" might yield

6    stronger results over the long run. *Id.* at 6. The Board later adopted the Committee's

7    recommendation. *See* Trial Ex. 79 at 2; *see also* Trial Ex. 86.

8         The WPS Funds remained on the "watchlist" for the remainder of 2016 and into

9    2017. They all underperformed in the second quarter of 2016 ("Q2 2016"), as a result of

10   a "V-shaped" decline and recovery related to the Brexit vote, *see* Trial Ex. 83A, but in

11   the third quarter of 2016 ("Q3 2016"), the WPS Conservative and Moderate Funds

12   finished "with returns relatively in-line with their" respective HUPs and Morningstar

13   Peer Groups, *see* Trial Ex. 90 at 2. The WPS Growth Fund, however, continued to trail

14   behind its benchmarks in Q3 2016, and Cook Street recommended "evaluating the

15   ongoing inclusion of the WPS Models in the Plan." *See id.*; *see also* Minutes (Nov. 4,

16   2016), Trial Ex. 93A at 4 ("The question is whether these funds are still meeting the

17   purpose for which they were added to the Plan. At this point Cook Street and the

18   Committee feel that the Unified Funds are meeting their purpose, but the Committee

19   would like to continue to closely monitor them.").

20        At the Committee meeting held on February 16, 2017, after the WPS Funds had

21   been on the "watchlist" for approximately nine months, Cook Street reported that their

22   "performance against peers ha[d] improved." Trial Ex. 99A at 3. Cook Street advised

23

1   keeping the WPS Funds on the "watchlist," explaining that "a fund should be on the

2   Watch List for a year before anything is done." *Id.*  During the fourth quarter of 2016

3   ("Q4 2016"), the Milliman assets within the WPS Funds declined as a result of the

4   implementation of "InvestMap" and the related change in the QDIA.[20]  *See* Trial Ex. 96A

5   at 39.  The non-Milliman assets in the WPS Funds also dropped, primarily in the WPS

6   Growth Fund, but the WPS Moderate and Conservative Funds "both saw growth in the

7   number of non-Milliman clients using the strategies." *Id.*  With respect to Milliman

8   investors, Cook Street observed that, despite the addition of "InvestMap" as an

9   Investment Alternative, Plan participants still had interest in the WPS Funds because they

10  "offer risk management that is not offered in other Plan investment options."  Trial

11  Ex. 99A at 3.  As of Q4 2016, roughly 20% of Plan assets were in the WPS Funds.  *Id.*

12          **d.      Events Leading to Removal from "Watchlist" in 2018**

13          As 2017 began, interest in the WPS Funds increased, with growth experienced in

14  both the number of non-Milliman clients and the amount of non-Milliman assets invested

15  in the WPS Funds.  Trial Ex. 104 at 2.  During the first quarter of 2017 ("Q1 2017"), each

16  of the three WPS Funds outperformed its Morningstar Peer Group and performed in line

17  with its HUP.  *Id.*  Nevertheless, the WPS Funds remained on the "watchlist" as a result

18  of their trailing returns over longer periods, namely the past year and the prior three

19  ─────────────

20  [20] Mattson contends that the Committee essentially ignored the Q4 2016 decrease in assets within the
    WPS Funds.  The Court disagrees.  Cook Street made the Committee aware of the quantum of outflows

21  from (and inflows into) the WPS Funds during the quarter, *see* Trial Ex. 96A at 119, and the Committee
    discussed the subject during its February 2017 meeting, *see* Trial Ex. 99A at 3.  Given the Investment
    Alternatives ("glidepaths" within "InvestMap") that became available in Q4 2016, the Committee's wait-

22  and-see approach with regard to the apparent spike in redemptions was reasonable.

23

1    years.  *Id.*  At the meeting on May 25, 2017, of the then-recently-consolidated

2    Committee, *see supra* note 2, Cook Street indicated that, beyond leaving the WPS Funds

3    on the "watchlist," it did not recommend any additional actions.  Trial Ex. 105A at 5.  In

4    response, the Committee inquired what would be required for Cook Street to make a

5    recommendation and what might be a replacement for the WPS Funds.  *Id.*  Cook Street

6    answered that it could recommend removal of the WPS Funds if it believed they were

7    "no longer a valuable addition to the Plan line-up," but roughly $200 million in Milliman

8    assets were in the WPS Funds, evidencing participants' desires to have these Investment

9    Alternatives in the Plan.  *Id.*  Cook Street further replied that, although a "balanced fund"

10   might serve as a replacement for the WPS Funds, nothing that was "apples-to-apples"

11   existed.  *Id.*

12       The performance of the WPS Funds in the second quarter of 2017 ("Q2 2017")

13   was also positive, with each of the three funds outpacing its Morningstar Peer Group and

14   tracking its HUP.  Trial Ex. 109 at 2.  The Committee was advised at its meeting on

15   August 23, 2017, that FRM had made two changes to the Overlay, namely (i) altering the

16   volatility model to reflect components across international stock markets, and (ii) using

17   intra-day, rather than just end-of-day, data.  Trial Ex. 110A at 3.  The Committee again

18   discussed with Cook Street whether it "should look at other funds with a hedging aspect."

19   *Id.*  The Committee, however, accepted Cook Street's recommendation that the WPS

20   Funds "Remain in Plan."  Trial Ex. 108 at 46.

21       Growth in non-Milliman clients and assets in the WPS Funds, as well as outpacing

22   with respect to Morningstar Peer Groups, continued into the third quarter of 2017 ("Q3

23

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 35

2017).  Trial Ex. 112 at 2.  Cook Street signaled that, if the WPS Funds could sustain this improved level of performance, removal from the "watchlist" might be warranted.  *Id.*  At the Committee's meeting on November 29, 2017, Cook Street indicated that, although it was not recommending any action at the time, based on only performance, without considering any other criteria, the WPS Funds could come off the "watchlist."  Trial Ex. 113A at 3.[21]  The general consensus at the meeting was that the Committee should hear from FRM before deciding whether to remove the WPS Funds from the "watchlist."  *Id.*

The WPS Funds again performed well in the fourth quarter of 2017 ("Q4 2017"). Trial Ex. 115 at 3.  Despite Cook Street's suggestion at the Committee's meeting on February 13, 2018, for Q4 2017, that "the Unified Funds could be removed from the Watch List," Trial Ex. 117A at 3, the WPS Funds remained on the "watchlist" for nine more months, until after the Committee's meeting on November 13, 2018, *see* Trial Ex. 131A at 2.  In the meanwhile, the Committee watched a presentation by FRM, in which it was told that "hedging programs saved the life insurance industry about $40 billion in September and October of 2008," that, during 2016, when "[p]eople were dumping stocks almost like it was 2008 all over again," the risk management strategy "reduced drawdowns and lowered volatility," and that FRM "continually works on

---

[21] At trial, Mattson's expert witnesses agreed that the WPS Funds performed similarly to, or better than, their comparators in 2017.  *See* Tr. (Apr. 9, 2024) at 140:3–141:8; Tr. (Apr. 2, 2024) at 21:17–23:21. Notably, during this same timeframe, Mattson withdrew all of her money from the Milliman Plan.  *See supra* p. 4.

1    ongoing strategy research designed to improve investor outcomes." Trial Ex. 118

2    (Feb. 13, 2018) at 3, 14 (quoting CNN), & 25.  The Committee also received three more

3    quarters of performance data, which was not particularly glowing for the first quarter of

4    2018 ("Q1 2018"), *see* Trial Ex. 120 at 2, but which indicated that each WPS Fund

5    outpaced its Morningstar Peer Group and Target Risk Index during both the second and

6    the third quarter of 2018 ("Q2 2018" and "Q3 2018"), *see* Trial Ex. 126 at 2; Trial

7    Ex. 130 at 2.  During the period spanning Q1 2018, Q2 2018, and Q3 2018, the WPS

8    Moderate Fund experienced a steady growth in non-Milliman assets (increasing from 149

9    to 191 clients), while the other two funds remained relatively stable.  Trial Ex. 120 at 2;

10   Trial Ex. 126 at 2; Trial Ex. 130 at 2.  When Cook Street made its formal

11   recommendation to remove the WPS Funds from the "watchlist," the Committee was

12   well-situated to and could reasonably conclude that it was "comfortable with the

13   decision."  Trial Ex. 131A at 2.

14          The termination of "watchlist" status did not, however, halt Cook Street's or the

15   Committee's close monitoring of the WPS Funds.  Cook Street continued, until the

16   second quarter of 2022 ("Q2 2022"), more than six months after this litigation began, to

17   prepare a separate quarterly handout dedicated to a review and analysis of the WPS

18   Funds.  *See* Trial Exs. 135 (also 363), 138, 143, 149, 153, 156, 160, & 187.  The last of

19   Cook Street's standalone investment handouts about the WPS Funds contained the

20   following charts, which show absolute performance (returns per quarter) and risk-

21   adjusted performance (Sharpe Ratios) for each of the WPS Funds, as compared with the

22

23

1    respective Morningstar Peer Group, over the prior three years (*i.e.*, for the period

2    Q1 2019 – Q2 2022).



14   Trial Ex. 187 at 14.

1
2
3
4
5
6
7
8
9
10
11



12  Trial Ex. 187 at 15.

13      Beginning with its report for the third quarter of 2022 ("Q3 2022"), Cook Street

14  consolidated the information about the WPS Funds into its quarterly "Investment

15  Management Review" for the entire Plan.  *See* Trial Ex. 194 at 35–52.  Thereafter, the

16  Committee still received detailed data about the WPS Funds, but within the context of

17  Cook Street's analysis about all Investment Alternatives in the Plan.  *See* Trial Exs. 195A

18  & 197.  In its report for the fourth quarter of 2022 ("Q4 2022"), Cook Street included

19  graphs, which are reproduced on the next page, showing performance data for each

20  WPS Fund, as compared with its Morningstar Peer Group, over the previous ten years.

21
22
23

1



2

3

4

5

6

7

8



9

10

11

12

13

14

15



16

17

18

19

20

21

22
Trial Ex. 195A at 55–57.

23

With respect to the ten-year period ending on December 31, 2022,[22] which contains seven of the almost eight years of the Class Period, these figures indicate that (i) the WPS Conservative Fund consistently outperformed its Morningstar Peer Group, (ii) the WPS Moderate Fund kept pace with its Morningstar Peer Group, and (iii) although the WPS Growth Fund did not produce as much in returns, it also did not experience as much volatility as its Morningstar Peer Group, and thereby offered a "smoother ride" for its investors.  The Court now turns to the question of whether the Committee, and by extension the Board or Milliman, persistently armed with this level of detail and generally favorable statistics, breached any ERISA duty by not removing or replacing the WPS Funds.

---

[22] Throughout the course of trial, Milliman suggested that a "full market cycle" is the appropriate timeframe for evaluating an investment.  One of Milliman's experts, however, acknowledged that the term "full market cycle" does not have a "set definition."  Tr. (Apr. 8, 2024) at 166.  Nevertheless, this expert, Jennifer Conrad, Ph.D., who is the Dalton L. McMichael Sr. Distinguished Professor of Finance at the Kenan-Flagler Business School, which is part of the University of North Carolina at Chapel Hill, where she has been tenured since 1992 and on the faculty since 1985, described a "full market cycle" as a period during which the market goes from trough to peak to trough, or from peak to trough to peak.  *Id.* She explained that peaks and troughs are typically determined through hindsight, and that economists generally wait for the National Bureau of Economic Research to announce, after the fact, that a recession has occurred.  *Id.* at 166–67.  According to Conrad, when measuring the performance of an investment, a long sampling period involving different economic conditions or market states is desired.  *Id.* at 166.  Conrad's proposition that more data is better comports with common sense, and the Court accepts the concept, but rejects any contention by Milliman that the WPS Funds could not be adequately analyzed within the Class Period because a "full market cycle" had not been experienced.  Neither Cook Street nor the Committee operated under such belief, and during the Class Period, the fiduciaries for the Plan were provided with, and took action on the basis of, performance data for a range of timeframes other than "a full market cycle," namely quarterly, one-year, and three-year returns, which were routinely reviewed, and five-year and ten-year results, which were considered as they became available.

**Conclusions of Law**

**A.      Breach of Fiduciary Duties**

**1.      The Duty of Prudence**

ERISA's duty of prudence requires a fiduciary of a 401(k) plan to act

> with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]

29 U.S.C. § 1104(a)(1)(B).  In enforcing this duty of prudence, courts focus on both the

procedural and substantive aspects of an ERISA fiduciary's conduct, inquiring whether

the fiduciary followed prudent processes and made prudent decisions.  *See Tibble v.*

*Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016); *see also Fish v. GreatBanc Tr. Co.*,

749 F.3d 671, 680 (7th Cir. 2014).  This inquiry must be made from the perspective of

what was known and the circumstances prevailing at the time of the challenged action or

inaction, rather than from the "vantage point of hindsight."  *See Lauderdale v. NFP Ret.,*

*Inc.*, No. 8:21-cv-301, 2024 WL 751005, at *26 (C.D. Cal. Feb. 23, 2024) (citation

omitted); *see also Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).  Moreover, the

"character and aims of the particular type of plan" at issue are important considerations

when evaluating alleged imprudence.  *Lauderdale*, 2024 WL 751005, at *26 (citation

omitted).  At times, an ERISA fiduciary might face situations requiring "difficult trade-

offs," and courts must give "due regard to the range of reasonable judgments a fiduciary

may make based on her experience and expertise."  *Hughes*, 595 U.S. at 177; *see also*

*Beldock v. Microsoft Corp.*, No. 22-cv-1082, 2023 WL 1798171, at *6 (W.D. Wash. Feb.

7, 2023).  For the following reasons, the Court concludes that retaining the WPS Funds in the Plan was both procedurally and substantively prudent.

### a.     **Procedural Prudence**

With regard to the ongoing duty to monitor investment options and remove imprudent ones, courts have recognized the following hallmarks of prudent processes:

- meeting regularly to review and evaluate a plan's investments options[23]
- evaluating the reasons for any periods of underperformance[24]
- retaining an independent investment advisor, such as Cook Street[25]
- reviewing the investment advisor's reports and recommendations[26]

---

[23] *See, e.g.*, *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 693–95 & 704 (W.D. Mo. 2019) (noting that "before and at each meeting, the Committee thoroughly monitored the independent merits of each fund *in relation to funds from other asset management companies* to determine whether it was a prudent investment and should remain in the lineup" (emphasis in original)).

[24] *See, e.g.*, *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1098 (D. Colo. 2020) (indicating that, during quarters when the challenged investment options "did not meet all of the performance standards," the ERISA plan's independent investment consultant "explained the reasons for the underperformance").

[25] *See, e.g.*, *Ramos*, 461 F. Supp. 3d at 1123 (observing that "seeking independent, expert advice 'is evidence of a thorough investigation' by a fiduciary" (quoting *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998))); *Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 27, 2019) ("Appointment of an independent investment advisor, while not alone sufficient, provides 'evidence of a thorough investigation' and of ''procedural' prudence and proper monitoring.'" (citations omitted)).

[26] *See, e.g., Falberg v. Goldman Sachs Grp., Inc.*, No. 22-2689-cv, 2024 WL 619297, at *3 (2d Cir. Feb. 14, 2024) ("The Committee's independent advisor continually monitored and evaluated the Plan's investment options, and provided the Committee members with detailed information, 'including monthly and quarterly performance reports, written reports summarizing meetings with investment managers, . . . commentary and other information requested by the Committee on a periodic basis.'  Committee members reviewed those reports prior to attending Committee meetings." (record citation omitted)).

- questioning and probing the investment advisor on why it is making a particular recommendation[27]

- considering the quantitative and qualitative factors in the plan's investment policy statement and the mix of options available in the plan.[28]

Having considered the facts in light of these hallmarks, the Court concludes that Cook Street's and the Committee's diligent, persistent, and efficient efforts demonstrated the highest level of prudence. Mattson does not dispute that the Committee, assisted by Cook Street, engaged in hard, careful, and thorough work. Mattson takes aim instead at the Board, arguing that the Board's delegation to the Committee of monitoring

---

[27] *See, e.g., Cunningham v. Cornell Univ.*, 86 F.4th 961, 984 (2d Cir. 2023) ("The undisputed evidence shows that the RPOC [Retirement Plan Oversight Committee] engaged critically with [investment advisor] CAPTRUST's presentation, asking questions and, at times, expressing concerns about CAPTRUST's methodologies for evaluating particular investments."); *Ramos*, 461 F. Supp. 3d at 1130–31 ("The RPAC [Retirement Plans Advisory Committee] did not uncritically adopt [investment consultant] Slocum's recommendations. Rather, the RPAC engaged with Slocum representatives at the RPAC meetings to understand Slocum's reports, and to make informed decisions about the Fidelity Freedom Funds. The RPAC also tasked Slocum with performing additional work to determine the continuing appropriateness of including the Fidelity Freedom Funds as Level One investment options." (citations omitted)).

[28] *See, e.g., Cunningham*, 86 F.4th at 984 ("After the Internal Revenue Service updated its regulations on 403(b) plans, Cornell [University] formed the RPOC for the purpose of enhancing oversight of the plans. Cornell then engaged CAPTRUST as an outside consultant and launched a multi-year process focused on redesigning and streamlining the investment menu. . . . Once the IPS was approved in late 2012, Cornell initiated a much more systematized and in-depth review of the investment options, beginning in earnest with CAPTRUST's presentation of its performance analysis in July 2013. In this context, Cornell considered not only CAPTRUST's bottom-line recommendations, but also the quantitative and qualitative criteria described in the IPS, the availability of options among peer institutions, and the popularity of options among plan participants in developing a revised menu of investment options."); *Reetz v. Lowe's Cos., Inc.*, No. 5:18-cv-75, 2021 WL 4771535, at *57 (W.D.N.C. Oct. 12, 2021) ("Lowe's has added a passive equity option to the Plan investment menu. This option allows Plan participants to obtain full equity investment risk if they choose to do so. Having this additional option for participants (which [investment advisor] Aon had suggested that Lowe's consider at the time Lowe's engaged Aon as a delegated fiduciary), makes retention of Aon's more risk-adverse portfolio as a Plan choice more reasonable."), *aff'd*, 74 F.4th 171 (4th Cir. 2023).

responsibilities,[29] while retaining for itself decision-making authority for the Plan, was imprudent.

Mattson's theory relies on the opinion of Arthur B. Laffer, Ph.D.,[30] who testified as an expert on her behalf.  Laffer offered an opinion that delegating monitoring but not decision-making authority creates a risk that no one will take responsibility.  *See* Tr. (Apr. 2, 2024) at 87:21–89:19.  Expanding on Laffer's hypothesis, Mattson's attorney argued during closing that "[n]o one took responsibility," and that the Board was unaware of any problems with the WPS Funds, having not taken the time to "do what had to be done."  Tr. (Apr. 10, 2024) at 28:12–14.  The Court rejects Mattson's premise as contrary to ERISA jurisprudence, which is replete with instances in which a corporate board of directors retained decision-making authority, but delegated monitoring responsibility to a

---

[29] Mattson accuses both Committee and Board members of being inadequately trained concerning their fiduciary responsibilities.  The record does not support this criticism.  The Committee received training about fiduciary obligations from Susan Puz, a lawyer and the Chief Compliance Officer for Milliman, on November 3, 2015, *see* Trial Ex. 58, and the Board received such training on March 2, 2016, *see* Trial Ex. 67.  Puz attended all but about six of the Committee meetings, *see* Tr. (Apr. 1, 2024) at 38:19–22, recording the minutes when she was present, and updates or training concerning fiduciary duties were agenda items at numerous Committee meetings during the Class Period.  *See Falberg*, 2024 WL 619297, at *2 (observing that fiduciary training "is not a standard market practice").

[30] Laffer is the founder of Laffer Associates, an economic research and consulting firm.  He has a Ph.D. in economics from Stanford University and was on the faculty of the University of Chicago Graduate School of Business from 1967 to 1976, the University of Southern California from 1976 to 1984, and Pepperdine University from 1985 to 1988.  He served as an economic advisor to Presidents Richard Nixon, Ronald Reagan, and Donald Trump, and he has been described as the "Father of Supply-Side Economics."  Laffer has authored several books, and he serves on the boards of directors of several privately-held or publicly-traded companies.  He has a modicum of experience concerning "defined contribution retirement plans," including managing investment portfolios for General Electric Company and advising the fiduciaries of DuPont de Nemours, Inc.'s pension plan and of three public-employee retirement systems in California.

1  committee, without being found in breach of its duty of prudence.  *See supra* notes 23–

2  28.

3          Mattson's argument is also belied by the facts of this case.  The record in this

4  matter indicates the Board was advised in August 2015 that the Committee was closely

5  monitoring the WPS Funds for two reasons, namely (i) the change in trustee from

6  Huntington to Unified, and (ii) underperformance beginning in Q4 2014.  The Board

7  received a succinct explanation for the underperformance (*i.e.*, lags following "v-shaped"

8  recoveries), and it expressed its understanding that the Committee would continue

9  reviewing the WPS Funds.  The Board was informed, in the Committee's annual report

10  dated August 14, 2016, that the WPS Funds were on the "watch list," *see* Trial Ex. 84,

11  and during the Board's meeting on September 8, 2016, no questions were posed by "the

12  Board or its contacts," *see* Trial Ex. 88 at 3.  Contrary to Mattson's suggestion, the

13  absence of questions does not give rise to any inference of indifference or imprudence, as

14  opposed to complete comprehension, on the part of the Board, especially when, during

15  the same meeting, no inquiries were made about the anticipated roll-out of an entirely

16  new Investment Alternative, namely "InvestMap," one "glidepath" of which would be

17  designated as the QDIA.  *See* Trial Ex. 88 at 3; *see also* Trial Ex. 84 at 2.  Rather, the

18  evidence establishes that, when the Board needed to exercise its decision-making

19  authority, the Committee would prepare a separate report, as it did when it recommended

20  adding "InvestMap" to the Plan, as well as when it recommended removing an Eaton

21  Vance fund.  *See* Tr. (Apr. 8, 2024) at 93:15–94:6 & 102:4–103:2.

22

23

1   This division of labor between the Board and the Committee is consistent with

2   industry standards.  As explained by Milliman's expert, Charles Meythaler,[31] given the

3   size and complexity of the Plan, the Milliman Board could not possibly itself perform all

4   of the tasks necessary for prudent governance.  *See* Tr. (Apr. 8, 2024) at 57:9–59:3.

5   Some delegation was required, and the Board had the authority to entrust monitoring

6   duties to the Committee, as Mattson's expert (Laffer) acknowledged during trial.  *See* Tr.

7   (Apr. 2, 2024) at 90:17–22.  According to Meythaler, the amount and type of information

8   shared between the Board and the Committee, and the process by which it was conveyed,

9   compared favorably with the practices used within the retirement plan industry.

10   Tr. (Apr. 8, 2024) at 61:7–20.  The "vast majority" of the monitoring work was

11   performed by the Committee and the investment consultant, and the Board received

12   "high-level information" concerning whether "everything [is] on track with respect to the

13   Plan overall."  *Id.*  Unlike most other companies, however, Milliman is run like a

14   partnership, and the Committee's annual reports and separate recommendations went to

15

16   _____

17   [31] Meythaler has a juris doctorate from the University of Missouri at Columbia and holds a Financial
Industry Regulatory Authority ("FINRA") Series 7 license.  He has over forty years of experience in
investment consulting, asset management, consulting for investment managers and their customers, and in

18   the design and management of "defined contribution retirement plans."  From 1985 until 1993, he worked
for SEI Corporation, offering services similar to those of Cook Street.  For the next twenty years, he was
in executive positions with different asset management firms, working with different types of retirement

19   plans, including "defined benefit" and "defined contribution" plans.  In 2009, Meythaler returned to the
consulting field, spending one year with Shepherd Kaplan, LLC, helping to start a 401(k) plan for Delphi

20   (a General Motors spinoff), and then nine years with Mercer Investment Management, Inc., which
provides services as either an investment advisor, without discretion to make investment decisions, or an
"investment manager," with the "power to manage, acquire, or dispose of any asset of a plan."  *See* 29

21   U.S.C. §§ 1002(21) & (38).  Since 2020, Meythaler has been working as an independent consultant and as
an expert witness in various lawsuits.  Over the course of his career, he has participated in roughly 1,000

22   meetings of entities similar to the Committee in this case.

23

1    all principals of Milliman, not just the members of the Board.  *Id.* at 62:4–17.  Thus, at

2    Milliman, Plan performance information was disseminated more broadly than is typical

3    for similar ERISA plans.  *See id.*

4        The Court concludes that Milliman employed a prudent process in deciding to

5    keep the WPS Funds in the Plan.  Contrary to Mattson's contention, separating the

6    responsibility for monitoring the Plan from the authority to make decisions for the Plan

7    was not improper.  Rather, doing so enabled a group dedicated to the monitoring tasks,

8    *i.e.*, the Committee, to engage in more careful, detailed, and frequent analyses than was

9    possible for the Board.  This governance structure also limited the Committee's power,

10   thereby affording a "check and balance," *see* Tr. (Apr. 8, 2024) at 59:1–2, lest the

11   Committee (i) have too myopic a view, given its focus solely on the Plan versus other

12   issues Milliman might be facing, or (ii) engage in "groupthink," *see id.*, the psychological

13   phenomenon of reaching irrational or non-optimal decisions as a result of a desire for

14   harmony, conformity, or consensus.

15       As is evident from the record, the procedures for taking action with respect to the

16   Plan were clear and well-known to the Board and its delegee, the Committee.  The

17   method of communication between the Board and the Committee was consistent with or

18   in excess of the practices relating to other 401(k) plans of similar size.  The Committee

19   met on a regular basis (quarterly) and evaluated all of the Investment Alternatives in the

20   Plan, including the WPS Funds.  It retained and reasonably relied on the thorough reports

21   of an independent investment advisor (Cook Street) and sufficiently reviewed, inquired,

22   and probed before adopting (or, in some instances, rejecting) the investment advisor's

23

1    recommendations.  Both Cook Street and the Committee were guided by the various

2    iterations of the Plan's IPS, which according to Milliman's expert (Meythaler) was

3    typical of similar documents for "well run plans," Tr. (Apr. 8, 2024) at 68:14–21, and

4    they considered not only the WPS Funds' performance, but also how these target-risk

5    options fit within the mix of other Investment Alternatives and whether they continued to

6    meet the purposes for which they were added to the Plan.  In sum, the hallmarks of

7    procedural prudence are present.

8              **b.    <u>Substantive Prudence</u>**

9              The prudence standard set forth in ERISA Section 404 is an objective one.  *See* 29

10   U.S.C. § 1104(a)(1)(B); *see also Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917

11   (8th Cir. 1994).  The requisite inquiry is whether "a hypothetical prudent fiduciary would

12   have made the same decision."  *Ramos*, 461 F. Supp. 3d at 1129 (quoting *Tussey v. ABB,*

13   *Inc.*, 746 F.3d 327, 335 (8th Cir. 2014)).  Substantive prudence "is measured by what a

14   prudent fiduciary with 'like aims' would do in 'like circumstances,'" and not by the

15   results achieved with the investment.  *Id.* (citing 29 U.S.C. § 1104(a)(1)(B)); *see Roth*, 16

16   F.3d at 918.  A fiduciary acts in an objectively prudent manner even when not selecting

17   funds expected to provide higher returns if such alternative funds "would have resulted in

18   taking on more risk, subjecting participants to higher volatility and a higher likelihood of

19   losses as their retirement dates approached."  *Lauderdale*, 2024 WL 751005, at \*28.; *see*

20   *White v. Chevron Corp.*, No. 16-cv-793, 2017 WL 2352137, at \*10 (N.D. Cal. May 31,

21   2017) ("A fiduciary may reasonably select an investment alternative in view of its

22   different risks and features, even if that investment option turns out to yield less than

23

1    some other option."); *see also Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir.

2    2018) ("No authority requires a fiduciary to pick the best performing fund.").

3           In this matter, the Committee came to a reasoned decision that, consistent with

4    their long-term investment strategies designed to limit volatility and provide protection

5    against losses in down markets, the WPS Funds should remain in the Plan despite any

6    short-term underperformance.  ERISA jurisprudence supports the conclusion that the

7    Committee's actions were substantively prudent.  *See Lauderdale*, 2024 WL 751005,

8    at *30; *Reetz*, 2021 WL 4771535, at *30; *Ramos*, 461 F. Supp. 3d at 1096–98; *Wildman*,

9    362 F. Supp. 3d at 707.  This conclusion holds true even though the WPS Funds under-

10   performed their one-year and three-year benchmarks.  *White v. Chevron Corp.*, No. 16-

11   cv-793, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016); *see Jenkins v. Yager*,

12   444 F.3d 916, 926 (7th Cir. 2006) ("Nothing in the record suggests that it was not

13   reasonable and prudent to select conservative funds with long-term growth potential and

14   to stay with those mutual funds even during years of lower performance.").

15          Contrary to Mattson's argument, the WPS Funds' underperformance with respect

16   to certain benchmarks during a three-year (or even five-year) period is insufficient to

17   prove substantive imprudence.  *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166

18   (6th Cir. 2022) ("Precipitously selling a well-constructed portfolio in response to

19   disappointing short-term losses, as it happens, is one of the surest ways to frustrate the

20   long-term growth of a retirement plan.  Any . . . rule [requiring such sales] would mean

21   that every actively managed fund with below-average results over the most recent five-

22   year period would create a plausible ERISA violation. . . .  [and likely] lead to the

23

1   disappearance of this option in ERISA plans." (citation omitted)).  Removing the WPS

2   Funds from the Plan based on only three (or even as much as five) years of

3   underperformance would have been inconsistent with the Plan's IPS and the WPS Funds'

4   long-term focus.  Moreover, after the mid-2017 changes that FRM made to the Overlay,

5   and amidst the market downturns in 2020 and 2022, the WPS Funds have proven that

6   they serve the purposes for which they were added to the Plan, protecting investors from

7   experiencing large losses during periods of high volatility, while outpacing or closely

8   tracking the performance of peer group funds.  Mattson has failed to establish that "a

9   prudent fiduciary in [Milliman's] position 'would have acted differently,'" *Falberg*,

10  2024 WL 619297, at *3, and the Court concludes that retaining the WPS Funds in the

11  Plan was both procedurally and substantively prudent.

12                          **c.    Loss and Loss Causation**

13          The parties disagree concerning whether Mattson must establish loss causation or

14  whether, if Mattson proved a breach of fiduciary duty, the burden would shift to Milliman

15  to disprove any loss resulted from such ERISA violation.  *Compare* Def.'s Trial Br. at 21

16  (docket no. 170) *with* Pl.'s Trial Br. at 17–18 (docket no. 175).  Given the Court's rulings

17  that no breach has been shown and that, for the reasons to be discussed, the WPS Funds

18  did not suffer any loss, the Court need not address which party bears the burden of proof

19  with respect to loss causation.

20          Losses for claims that 401(k) plan fiduciaries breached ERISA's duty of prudence

21  are measured by "the difference between a plausible estimate of the Plans' investment

22  returns had they been prudently managed and the Plans' actual investment returns."

23

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 51

1  *Munro v. Univ. of S. Cal.*, No. 2:16-cv-06191, 2022 WL 16955481, at *4 (C.D. Cal.

2  Nov. 1, 2022) (citing *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("One

3  appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust

4  beneficiaries to the position they would have occupied but for the breach of trust.")).  In

5  contrast to what is required by law, namely plausibility, Mattson's theory of damages is

6  premised entirely on the performance of theoretical portfolios that were not available on

7  the market and included no volatility management (*i.e.*, the HUPs), as compared with the

8  results of the WPS Funds during the Class Period.  In arguing that the disparity in returns

9  between the HUPs and associated WPS Funds constitutes the measure of loss for the

10  Plan, Mattson has relied on the opinion of her expert Horacio Valeiras, the CEO and co-

11  founder of Frontier Global Partners, LLC.[32]

12      Valeiras estimated that the WPS Funds caused the Plan to lose over $54 million.

13  He did so using the following methodology.  For each year during the Class Period, he

14  multiplied the difference in performance between a WPS Fund and its related HUP,

15  expressed as a percentage, by the WPS Funds' asset level at the beginning of the year, to

16  arrive at the alleged loss for the year.  For example, for the year 2020, Valeiras provided

17  the following figures:

18

19  _____

20  [32] Valeiras has a master of business administration degree, with an emphasis in finance, from the
University of California, Berkeley, as well as a master's degree in chemical engineering from the
Massachusetts Institute of Technology.  He has held FINRA Series 3, 7, 16, 24, and 63 licenses, and has

21  been a chartered financial analyst since 1989.  He has worked for a number of investment companies,
including Morgan Stanley Investment Management and Allianz Global Investors Capital.  He has been

22  qualified as a valuation expert in various federal and state court matters.

23

| 2020 | Conservative | Moderate | Growth |
|---|---|---|---|
| WPS Fund Performance | 9.00% | 8.15% | 6.11% |
| HUP Performance | 14.61% | 17.29% | 16.67% |
| Asset Level | $48,684,566 | $92,665,339 | $91,091,164 |
| Alleged Loss | ($2,870,625) | ($8,438,241) | ($10,817,629) |

*See* Revised Tables 12–14 in Valeiras Rebuttal Report (Trial Ex. 213).[33]  Valerias then

summed up the alleged annual losses, arriving at the following alleged deficits over the

Class Period:

| | |
|---|---|
| WPS Conservative Fund | $  4.88 million |
| WPS Moderate Fund | $20.14 million |
| WPS Growth Fund | $29.27 million |
| TOTAL | $54.29 million |

*Id.*  The comparison between the returns of the WPS Funds and the performance of their

respective HUPs does not, however, prove any Plan losses.  Instead, what it shows is the

result that an investor might have achieved using the same asset allocations and assuming

an unlimited amount of risk (or, in other words, having no risk protection from a hedging

strategy).

The following graphs from Cook Street's report for the first quarter of 2020

("Q1 2020"), when the domestic and global economies drastically contracted as a result

of the coronavirus disease ("COVID") pandemic, illustrate the relationship between the

WPS Funds and their respective HUPs.

---

[33] In his initial report, Valeiras reported different numbers for 2020, *see* Trial Ex. 211 at Tables 12–14, and when asked why the values had changed in his rebuttal report, Valeiras indicated that he could not remember.  Tr. (Apr. 9, 2024) at 138:13–22.





Trial Ex. 156 at 9–11.  As shown in these charts, during periods of high volatility (*see* yellow lines) and market decline, the Overlay (MMRS) causes the WPS Funds to reduce their equity exposures (*see* gray lines), and the WPS Funds (*see* blue lines) will generally outperform their respective HUPs (*see* orange lines).  On the other hand, when volatility is low, the equity allocations and returns of the WPS Funds and comparable HUPs will be roughly equivalent.  As discussed earlier, when markets rebound quickly (*i.e.*, experience a "v-shaped" recovery), the WPS Funds will have, for up to a week or so, while hedging

strategies are being removed, lower net equity positions than their comparable HUPs, and thus, will participate in less upside capture.[34]

In contrast to Valeiras's WPS Fund-to-HUP performance comparisons, Milliman's expert, Jennifer Conrad, Ph.D., whose credentials were earlier summarized, *see supra* note 22, has used Sharpe Ratios to analyze whether the risk-adjusted returns of the WPS Funds are equivalent to those of the correlated HUPs. She testified that no statistically-significant difference can be observed. Tr. (Apr. 8, 2024) at 180:14–181:5. Conrad's calculations are reproduced in the following table.

---

[34] Mattson contends that the Committee was delinquent in not considering upside/downside capture ratios. Mattson, however, did not provide reliable evidence concerning such ratios. Valeiras computed either quarterly or annual upside and downside captures for the WPS Funds by comparing their returns during positive and negative markets, respectively, against the performance of the Standard and Poor's ("S&P") 500. *See* Tr. (Apr. 5, 2024) at 80:10–16; *see also* Revised Tables 10 & 11 to Valeiras Rebuttal Report (Trial Ex. 213). The S&P 500 is an index of "500 stocks intended to be a representative sample of leading companies in leading industries within the U.S. economy." *See* https://www.sec.gov/answers/indices.htm. By definition, the S&P 500 does not reflect the blend of assets in the WPS Funds, which each have a mix of large, mid, and small cap and international equity ETFs and mutual funds, as well as bonds and cash. *See* Trial Ex. 4. For example, during Q1 2018, when Valeiras indicated that the WPS Conservative Fund captured 170% of the downside of the S&P 500, the WPS Conservative Fund's allocation in Vanguard's S&P 500 ETF was only 33.98%, and in Q2 2018, when Valeiras calculated that the WPS Conservative Fund captured only 28% of the upside of the S&P 500, the WPS Conservative Fund had only 35.12% of its contributions in Vanguard's S&P 500 ETF. Trial Ex. 4 at 75 & 79. Despite the WPS Conservative Fund's relatively low investment in a large cap ETF (34.3% on average for 2018, *see* Trial Ex. 4), Valeiras has analyzed its performance as though 100% of its assets were allocated to a large cap ETF. Moreover, Valeiras's methodology presupposes that participants in the WPS Funds would have withdrawn their money on a quarterly or annual basis and thereby "captured" the gain or loss, which is inconsistent with the concept of saving for retirement and the design of the WPS Funds. Although the Court does not doubt that upside and downside captures may be determined, the Court is not persuaded that Valeiras's approach was appropriate. During trial, Milliman's expert (Conrad) explained that measuring upside and downside captures requires making several choices, including a reference point, an interval, and a base or underlying portfolio for making comparisons. Tr. (Apr. 9, 2024) at 45:19–46:1. Conrad testified that upside/downside capture ratios are not often used in academic research, and they are typically applied to market-timing strategies, which are different from the Overlay. *Id.* at 46:2–7. Given the complexities of upside and downside capture computations, and their lack of suitability for the type of investment at issue, which relies on volatility forecasting and not market predictions, *see id.*, the Court concludes that, to the extent the Committee did not ask for or review upside/downside capture ratios, it did not act imprudently.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 55

| | Annualized Sharpe Ratios | |
|---|---|---|
| | Class Period (1/13/16 – 6/30/23)[35] | Since Inception (11/5/12 – 6/30/23) |
| WPS Conservative Fund | 0.6557 | 0.6820 |
| Conservative HUP | 0.5957 | 0.6525 |
| WPS Moderate Fund | 0.6305 | 0.6311 |
| Moderate HUP | 0.6131 | 0.6482 |
| WPS Growth Fund | 0.5638 | 0.5586 |
| Growth HUP | 0.5798 | 0.6053 |

*See* Table 3 in Conrad Rebuttal Report (Trial Ex. 432). The foregoing table demonstrates that the WPS Funds performed as expected during the Class Period, offering virtually the same risk premiums as the related HUPs, or in other words, the same additional returns per unit of risk when compared to the returns of a risk-free investment.

In his reports and during trial, Mattson's expert (Valeiras) did not dispute the appropriateness of using Sharpe Ratios to evaluate investment performance relative to risk. Indeed, Valeiras engaged in an analysis identical to Conrad's, but he computed Sharpe Ratios for periods of time that either have no relevance (*i.e.*, 2013–2015, which predates the Class Period) or are too brief (*i.e.*, 2016, which is only one of the almost eight years at issue). *See* Table 9 in Valeiras 2d Supp. Report (Trial Ex. 215); *see also* Table 9 in Valeiras Report (Trial Ex. 211). Given Valeiras's acknowledgement that Sharpe Ratios provide a meaningful basis for understanding how the WPS Funds performed relative to their respective HUPs, and Conrad's computations demonstrating

---

[35] Because Conrad prepared her initial report before the Class was certified, she did not know that the Class Period would extend through October 6, 2023, and she instead used June 30, 2023, as the end date.

1  roughly equivalent Sharpe Ratios for each set of WPS Fund and associated HUP, the

2  Court concludes that Mattson has failed to offer a plausible estimate of any loss suffered

3  by the Plan.

4      In addition, Milliman has shown that no loss has been experienced by investors in

5  the WPS Funds during the Class Period.  Milliman's expert (Conrad) has appropriately

6  compared the WPS Funds' performance to the median cumulative returns of correlated

7  Morningstar Peer Groups, as shown in the following table.

8  **January 1, 2016 – June 30, 2023:**

| | Net Equity Allocation | Volatility | Cumulative Return |
|---|---|---|---|
| WPS Conservative Fund | 50.1% | 7.7% | 51.0% |
| Morningstar Peer Group | 30–50% | 8.3% | 36.7% |
| WPS Moderate Fund | 67.2% | 9.0% | 60.3% |
| Morningstar Peer Group | 50–70% | 10.4% | 59.7% |
| WPS Growth Fund | 76.7% | 9.7% | 59.9% |
| Morningstar Peer Group | 70–85% | 13.0% | 66.3% |

14  Table 4 to Conrad Rebuttal Report (Trial Ex. 432).  Conrad has checked this analysis by

15  selecting from the three Morningstar Peer Groups the funds with volatilities within

16  $\pm$ 0.5%, or alternatively $\pm$ 1%, of the WPS Funds' actual volatility during the Class

17  Period,[36] and using for WPS Fund evaluation purposes the cumulative returns for just

---

[36] Mattson challenges Conrad's use of different subsets (*i.e.*, the $\pm$ 0.5% subset, and the $\pm$ 1% subset) of the Morningstar Peer Groups on the ground that her analysis was conducted *post hoc* and subject to manipulation to produce a favorable result.  The Court finds this accusation unwarranted.  Conrad was attempting, through this methodology, to double-check the comparisons between the WPS Funds and their designated benchmarks.  She selected funds from these benchmarks (the Morningstar Peer Groups) on the basis of observed volatility, not performance.  No evidence exists of any cherry-picking or other mishandling of data on Conrad's part.

those subsets of the Morningstar Peer Groups.  Conrad's results are summarized in the

following table.

**January 13, 2016 – June 30, 2023:**

|  |  | Volatility | Cumulative Return |
|---|---|---|---|
| WPS Conservative Fund |  | 7.4% | 54.5% |
| Peer Group Subset (±0.5%) 23 Funds |  | 6.9%–7.9% | 43.0% |
| Peer Group Subset (±1%)  52 Funds |  | 6.4%–8.4% | 42.2% |
| WPS Moderate Fund |  | 9.2% | 65.3% |
| Peer Group Subset (±0.5%) 21 Funds |  | 8.7%–9.7% | 58.0% |
| Peer Group Subset (±1%)  55 Funds |  | 8.2%–10.2% | 51.2% |
| WPS Growth Fund |  | 10.1% | 64.4% |
| Peer Group Subset (±0.5%) 18 Funds |  | 9.6%–10.6% | 56.8% |
| Peer Group Subset (±1%)  57 Funds |  | 9.1%–11.1% | 66.3% |

Conrad Report at ¶¶ 60–61 (Trial Ex. 431).

        As reflected in these tables, the WPS Conservative Fund and WPS Moderate Fund

have higher cumulative returns than the median of their Morningstar Peer Groups,

regardless of whether volatility was roughly equivalent (within ± 0.5% or ± 1%) or not.

The WPS Growth Fund outperformed the funds in its Morningstar Peer Group that had

similar volatility (within ± 0.5%), but it did not compare as favorably with the funds in

the Morningstar Peer Group that experienced higher volatility (± 1% or higher).  Because

the Morningstar Peer Groups represent available alternatives to the WPS Funds, most of

which have similar equity allocations, and many of which have had equivalent volatilities

during the timeframe at issue, the Court concludes Conrad and Milliman have provided

the requisite "plausible" estimate, which leads to the conclusion that the Plan did not

1   suffer any loss as a result of keeping the WPS Funds in the Plan during the Class Period.

2   For all of the foregoing reasons, Mattson's imprudence claim fails.

3        2.      **The Duty of Loyalty**

4        To prevail on her breach-of-loyalty claim, Mattson must establish that Milliman

5   failed to act "solely in the interest of the [Plan's] participants and beneficiaries and . . .

6   for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries;

7   and (ii) defraying reasonable expenses of administering the plan[.]"  *See* 29 U.S.C.

8   § 1104(a)(1)(A).  The existence of a conflict of interest does not constitute a *per se*

9   breach of the duty of loyalty.  *See Friend v. Sanwa Bank Cal.*, 35 F.3d 466, 468–69 (9th

10  Cir. 1994) ("[N]owhere in the statute does ERISA explicitly prohibit a trustee from

11  holding positions of dual loyalties.").  Moreover, the "mere fact that 'a plan fiduciary has

12  'financial interests adverse to beneficiaries'' is not enough to show a breach of the duty

13  of loyalty."  *Ramos*, 461 F. Supp. 3d at 1125 (quoting *DiFelice v. U.S. Airways, Inc.*, 497

14  F.3d 410, 421 (4th Cir. 2007)).  Likewise, retaining proprietary investments—even if

15  they underperform—without more, is not evidence of disloyalty.  *See Lauderdale*, 2024

16  WL 751005, at *24; *Reetz*, 2021 WL 4771535, at *46–48; *Wildman*, 362 F. Supp. 3d

17  at 701 ("[I]t is not disloyal as a matter of law to offer only proprietary funds.  In fact, it is

18  common for financial service companies to offer their own investment funds in their

19  retirement plans." (citations omitted)).

20       The record reflects that the Board and the Committee kept the WPS Funds in the

21  Plan because they genuinely believed that continuing to offer the WPS Funds served the

22  best interests of Plan participants, as opposed to those of FRM or Milliman.  From the

23

moment the WPS Funds were first considered for addition to the Plan, the Committee

was cognizant of, and took efforts to mitigate, any apparent conflict of interest.[37]  When

Cook Street later recommended replacing the WPS Moderate Fund with a non-Milliman

product as the Plan's QDIA, *see* Trial Ex. 76A at 1, the Committee did not hesitate to

adopt that recommendation, voting to designate the moderate "glidepath" of the

"InvestMap" option as the new QDIA, *id.* at 6.  The Committee did, however, hesitate in

removing the WPS Funds from the "watchlist," despite Cook Street's repeated

indications that improvements in the WPS Funds' performance warranted doing so.  Even

after the WPS Funds were released from "watchlist" status, the Committee continued to

receive separate reports from Cook Street about the WPS Funds and to closely monitor

them.  Mattson's breach-of-loyalty claim is based on nothing more than inclusion in the

Plan of an investment option as to which Milliman's subsidiary (FRM) serves as a

subadvisor.  This fact does not a breach-of-loyalty claim make.

Mattson's contention that the designation of the WPS Moderate Fund as the QDIA

was motivated by a desire to "seed" or "incubate" the WPS Funds, and thereby ensure

that they would endure, is both untimely asserted and unsupported by the evidence.

Because FRM had waived its fees, neither FRM nor Milliman financially benefitted from

---

[37] Contrary to Mattson's assertion, the reason for RV Kuhns's resignation as Milliman's investment advisor should not have raised any alarm or been viewed as a "red flag" by the Committee or the Board. RV Kuhns withdrew because it wished to recommend to its other clients that they invest in or offer the WPS Funds for which Milliman's subsidiary (FRM) served as a subadvisor, and it was concerned that doing so, while also serving as a consultant for Milliman, would present a conflict of interest.  *See* Trial Ex. 6 at 1–2.  RV Kuhns's choice to forego working for Milliman so as to preserve its own relationships with other entities does not support Mattson's contention that RV Kuhns suspected something was amiss with the addition of the WPS Funds to the Plan.

1   the WPS Moderate Fund being used as the QDIA or from the WPS Funds being in the

2   Plan.  *See Lauderdale*, 2024 WL 751005, at *24 (reasoning that the investment manager

3   would be entitled to "its asset-based delegated-fiduciary fee . . . regardless of what funds

4   it ultimately selected as the Plan's QDIA" ).  Moreover, the QDIA change that occurred

5   in 2016, to an option that does not employ the Overlay or raise the specter of any conflict

6   of interest on the part of FRM or Milliman, supports the conclusion that Milliman was

7   not acting disloyally or based on any monetary gain it might receive from including the

8   WPS Funds in the Plan, but was instead prioritizing the interests of Plan participants.

9        During his closing argument, Mattson's attorney asked why Milliman would care

10  if Unified "shut down" the WPS Funds in the event the Overlay was removed, suggesting

11  that Milliman's concern about such scenario was "damning evidence of disloyalty."  Tr.

12  (Apr. 10, 2024) at 30:12–25.  This contention lacks merit.  Unified is not interested in

13  marketing products with asset allocations similar to those of the WPS Funds, but that

14  have no volatility management or, in other words, funds similar to the HUPs, presumably

15  because such investment options are already readily available.  The Overlay makes the

16  WPS Funds unique, and the assertion that Milliman breached its duty of loyalty by not

17  forcing Unified to forego the hedging strategy (and to offer conventional funds) is simply

18  unwarranted.  By the same token, the proposition that Milliman should not "care" about

19  the health of the WPS Funds, in which roughly 20% of its employees have invested their

20  retirement savings, ignores the very law pursuant to which Mattson seeks recovery in this

21  litigation.  Monitoring whether the WPS Funds had sufficient assets under management

22  was required by the Plan's IPS, and Unified's continued satisfaction with and efforts to

23

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 61

1   market the WPS Funds were (and still are) important factors in deciding whether to keep

2   the WPS Funds in the Plan.  Mattson's view that the WPS Funds should have been

3   replaced with the hypothetical and unavailable HUPs, and that failure to do so stemmed

4   from some conflict of interest or disloyalty, is based purely on improper comparisons and

5   speculation, not evidence.  Mattson's breach-of-loyalty claim lacks merit.

6   **B.**      **Failure to Monitor**

7            An ERISA fiduciary is permitted to delegate certain responsibilities, including the

8   responsibility to track the performance of a plan's investment options, to a designated

9   person or entity.  *See* 29 C.F.R. § 2509.75-8.  ERISA imposes a "limited duty" upon

10  fiduciaries "to monitor and review the performance of their appointed fiduciaries."  *In re*

11  *Comput. Scis. Corp. ERISA Litig.*, 635 F. Supp. 2d 1128, 1144 (C.D. Cal. 2009) (citations

12  omitted).  To fulfill their duty to monitor, fiduciaries "should review the performance of

13  their appointees at reasonable intervals and in such a manner as may be 'reasonably

14  expected to ensure that their performance has been in compliance with the terms of the

15  plan' and statutory standards."  *Id.* (quotation omitted).  Claims that an ERISA fiduciary

16  failed to monitor a delegee are derivative of a breach-of-fiduciary-duty claim.  *Id.*

17  (citation omitted).  If the breach-of-fiduciary-duty claim fails, so too must the derivative

18  monitoring claim.  *Id.*; *accord Lauderdale*, 2024 WL 751005, at *33.  Because Mattson

19  has failed to prove her imprudence and disloyalty claims, her failure to monitor claim

20  also lacks merit.

21

22

23

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 62

**C.**     **Mattson's Motion to Amend the Class Period**

Prior to trial, Mattson filed a motion to amend the Class Period and to compel discovery.  At the Pretrial Conference, the Court deferred ruling on that motion until after trial.  *See* Minute Entry (docket no. 179).  Because Mattson has not prevailed on any of her claims, the duration of the Class Period is now a moot issue.  Accordingly, Mattson's motion to amend the Class Period and to compel discovery, docket no. 161, is DENIED.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)     These Findings of Fact and Conclusions of Law are entered in accordance with Federal Rule of Civil Procedure 52.  Any Finding of Fact later deemed a Conclusion of Law shall be treated as a Finding of Fact, and any Conclusion of Law later deemed a Finding of Fact shall be treated as a Conclusion of Law.

(2)     The Court concludes that it has subject-matter and personal jurisdiction and that venue is proper in this District; this matter arises under federal law, namely ERISA, defendant has its principal place of business in Washington, and the Plan is administered in this District.  *See* 28 U.S.C. §§ 1331 & 1391(b); 29 U.S.C. § 1132(e).

(3)     Plaintiff Joanna P. Mattson has failed to prove her claims against Defendant Milliman, Inc. for breach of the fiduciary duty of prudence, Am. Compl. at ¶¶ 217–27 (docket no. 44), breach of the fiduciary duty of loyalty, *id.*, and failure to monitor, *id.* at ¶¶ 228–33, and judgment shall be entered in favor of Defendant Milliman, Inc. and against Plaintiff Joanna P. Mattson as to all claims.

1    (4)    Mattson's motion to amend the Class Period and to compel discovery,

2    docket no. 161, is DENIED.

3    (5)    The parties are DIRECTED to meet and confer and to file a Joint Status

4    Report no later than June 28, 2024, concerning whether the Class should be decertified,

5    given that notice was not sent to putative members of the Class and Mattson has not

6    prevailed on her claims.

7    (6)    The Court will defer the entry of judgment pending review of the parties'

8    Joint Status Report.

9    IT IS SO ORDERED.

10   Dated this 17th day of June, 2024.

11

12                                                    _____
                                                      Thomas S. Zilly
13                                                    United States District Judge

14

15

16

17

18

19

20

21

22

23

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 64